RALPH E. GORDY AND KATHERINE F. GORDY, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 82044. Filed August 17, 1961.

*James J. Convery, Esq.*, for the petitioners.
*Stephen P. Cadden, Esq.*, for the respondent.

MULRONEY, *Judge:* The respondent determined deficiencies in petitioners' income tax for the years 1953 through 1956, as follows: 1953, $1,651.22; 1954, $2,652.88; 1955, $1,829.08; and 1956, $6,228.45. The questions for decision are whether amounts received from the sale of an option to purchase land and whether an amount received from the sale of an interest in an undeveloped tract of land are taxable as ordinary income or as capital gain.

FINDINGS OF FACT.

Some of the facts have been stipulated and they are found accordingly.

Petitioners, Ralph E. Gordy and Katherine F. Gordy, are husband and wife and live in Middletown, Delaware. They filed joint income tax returns for the calendar years 1953 through 1956 with the district director of internal revenue for the district of Wilmington, Delaware. The transactions here involved are those of Ralph E. Gordy and he will sometimes be referred to as petitioner.

In January 1952 petitioner entered into an agreement with Herman Duncan which provided, in part:

WHEREAS * * * [petitioner and Duncan] have had certain negotiations looking toward the development by [petitioner] of a certain tract of land * * * containing eighty-four (84) acres * * * and

WHEREAS * * * [petitioner] plans to divide the aforesaid eighty-four (84) acres, more or less, into building lots * * *.

Now, THEREFORE, WITNESSETH, that for and in consideration of the mutual covenants, promises and agreements herein contained to be kept and performed by the respective Parties hereto and of the sum of One Thousand Dollars ($1,000.00) paid by [petitioner] unto [Duncan] upon the execution of this Agreement * * * the Parties to this Agreement do hereby mutually covenant, promise and agree as follows, to-wit:

\* \* \* \* \* \* \*

2. [Petitioner] shall, at his expense, have prepared plots or plans whereon the aforesaid eighty-four (84) acres, more or less, shall be laid out in lots, [Duncan] agreeing that there shall be an average of at least four and one-half (4½) lots per acre throughout the entire eighty-four (84) acres, more or less, aforesaid, and that each of said lots shall consist of approximately sixty-six hundred (6600) square feet.

3. [Duncan] hereby agree[s] to grant unto [petitioner] the sole exclusive option right and privilege to purchase any or all of said lots to be laid out on or before June 1, 1956, at the price of Three Hundred Dollars ($300.00) for each

lot, * * * provided, however, that the [petitioner] shall purchase a minimum of seventy-five (75) lots on or before June 1, 1953, and a like number of lots during each successive one (1) year period thereafter until this option or any extension thereof shall have terminated.

\*        \*        \*        \*        \*        \*        \*

In the event the [petitioner] shall fail to purchase and pay, * * * the full consideration for a minimum of seventy-five (75) lots each year during the continuance of this option agreement, then this Agreement, at the option of [Duncan] shall become null and void. * * *

The land involved in this agreement will hereafter sometimes be called the Duncan tract or the Dunlinden tract.

In September 1952 petitioner entered into an agreement with the Cedar Construction Co., a corporation engaged in the development and sale of residential property, whereby Cedar agreed to purchase petitioner's interest in the Duncan agreement for $1,000 to be paid at the date of entering into the agreement and $113 for each lot as at the time the lot was sold to a purchaser after a house had been constructed on the lot. The agreement further provided that Cedar was not obligated to pay the amount contemplated by it, $41,906 (362 lots at $113 plus $1,000 initial payment), in excess of the amount set forth below in any given year.

| Year | Amount |
|---|---|
| 1952 | [1] $8,500 |
| 1953 | 12,000 |
| 1954 | 12,000 |
| 1955 | 9,406 |

[1] Including $1,000 initial payment.

Cedar Construction Co. was incorporated in 1950. At the time the agreement was entered into petitioner owned 60 percent of its stock and his sister and her husband owned 40 percent of it. Petitioner realized the following amounts from the transaction: $9,492 in 1953, $12,204 in 1954, $9,266 in 1955, $9,040 in 1956, or a total of $40,002.

On September 14, 1955, petitioner and his father each purchased a one-half interest in a farm of about 46 acres from Roswell Schafer. The purchase price was about $1,000 an acre. On the same day they entered into a subsidiary agreement with Schafer which provided for Schafer to convey 0.685 acres to them for an entranceway to the land and also provided for Schafer to give them an option to purchase an additional 0.685 acres for a second entranceway should they require it. The agreement provided, in part:

[Schafer] agrees that [petitioner and his father] shall have the sole right to select the location of an entranceway, [measurements] to said main tract, when the main tract (46.085 acres) hereinbefore referred to, has been layed out in streets, avenues and lots for development purposes by [petitioner and his father] * * *.

\*        \*        \*        \*        \*        \*        \*

[Petitioner and his father] at their expense, agree to erect and construct (when home construction on said tract shall begin) a suitable fence not to exceed four (4) feet in height, along the easterly line of the aforesaid main tract * * * to provide [Schafer] with reasonable privacy against future occupancy of the said main tract, when developed.

This land was purchased for use as a dogracing track. It later became apparent that dogracing would not soon be legalized in Delaware, and on October 19, 1955, petitioner and his father entered into an agreement to sell it to Garden Park Homes, Inc., a corporation engaged in the development and sale of residential property. Title was to be transferred to the corporation between March 15 and April 1, 1956. The sale was duly consummated. Petitioner was president of Garden Park Homes, Inc., and owned 60 percent of its stock. His sister and brother-in-law owned the remaining 40 percent of its stock. In 1956 petitioner realized a total gain of $13,125 from the sale of the Schafer farm to Garden Park Homes, Inc.

Prior to the option transaction concerning the Duncan tract, petitioner, in 1952, had a half interest in a $500 option which was allowed to lapse. In 1956 he executed an option on land. It was allowed to lapse in 1957.[1] During the years in question petitioner owned a small apartment building in Philadelphia which he held as a rental property, a half interest in an office building also held for rental purposes, and some lots in Cape May, New Jersey, which were acquired as security for a loan to his sister. In about 1956 petitioner acquired a restaurant and filling station which he rented. Petitioner was also a stockholder and officer in a number of corporations which were engaged in real estate activities. In summary, these were as follows:

| Name of company | Petitioner's interest | Others' interest | Petitioner's activity | Corporate activity |
|---|---|---|---|---|
| Basin Road Construction Co. | 60% shareholder. | Sister 40%--- | President, director. | Development of residential tracts of land. |
| Basin Road Shopping Center. | 60% shareholder. | Sister 40%--- | (¹) | Development of a shopping center (inactive). |
| Cedar Construction Co----- | 60% shareholder. | Sister, et ux. 40%. | President--- | Development of residential tracts. |
| Fordham Construction Co_ | 100% shareholder. | None-------- | President--- | Development of residential tracts. |
| G & G Aluminum Window Corp. | 50% shareholder. | 50%-------- | Officer-director. | Fabrication of aluminum windows. |
| Garden Park Homes, Inc--- | 60% shareholder. | Sister, et ux. 40%. | President-director. | Development of residential tracts. |
| Gordy & Son Co----------- | 100% shareholder. | None-------- | President--- | Development of residential tracts and management. |
| Gordy Construction Co----- | 50% shareholder. | Sister 50%--- | President--- | Development and sale of residential lots on land it owns. |
| Gordy and Rang, Inc------- | (¹) | (¹) | President--- | Development and sale of residential tracts. |
| State Heating Co----------- | (¹) | (¹) | Officer------ | Installation of heating systems in development houses. |
| University Homes, Inc------ | 100% shareholder. | None-------- | President--- | Development of residential tracts. |
| Basin Road Rental Co----- | (¹) | (¹) | (¹) | Owns homes held for rent in a housing development. |

¹ Not in record.

[1] Petitioner also entered into an option agreement relating to 0.685 acres for an additional entranceway to the Schafer property, but for purposes of this opinion this has no independent significance.

All of the above corporations actively carried on corporate business functions with the possible exception of Basin Road Shopping Center.

On his income tax returns for the years 1953 through 1956, petitioner reported the amounts received from the Duncan and Schafer tracts, set forth above, under the installment method as long-term capital gain. Respondent, in the notice of deficiency, determined that said amounts "represent ordinary taxable income" rather than long-term capital gain.

OPINION.

The question for decision is the character of the gains received by petitioner in the Duncan and Schafer transactions. The amounts are stipulated and respondent does not question petitioner's use of the installment method of reporting.

Petitioner reported his gains from the two transactions as capital gains, resulting from the sale of capital assets. Respondent determined the gains were ordinary income resulting from the sale of "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business," within the provisions of section 117(a)(1), I.R.C. 1939, and section 1221(1), I.R.C. 1954, which define the term "capital asset" as not including such property.[2]

All that we have here are two isolated transactions. They are transfers of property by petitioner, the president of two corporations, to each of the two corporations both of which were engaged in the business of real estate development, including the sale of lots to individual purchasers and both of which were controlled (60 percent) by petitioner. We see nothing in this record which would warrant the conclusion that at the time of the transfer petitioner held this property primarily for sale to customers in the ordinary course of *his* trade or business.

Respondent's argument ignores the corporate entities of which petitioner was merely an executive officer. It attributes the corporation's sales of lots to individual purchasers, to petitioner. Respondent recognizes no distinction between a taxpayer holding property for sale to his customers and a taxpayer holding property for sale to his controlled corporation engaged in selling such property to its customers. Petitioner's business was that of a corporate executive. There is no justification for imputing the real estate activities of the many corporations he owns, or controls, to him. Such transactions as are here involved might be vulnerable to a conflict-of-interest charge

---

[2] In *Glasgow Village Development Corporation*, 36 T.C. 691, where the facts were quite similar, respondent gave a different reason for determining such gains ordinary income. There the president of a corporation bought, with others, the tract adjoining the corporation's subdivision. When he and his coowners sold it to the corporation at a profit, respondent determined the president's gain represented a distribution of income taxable as a dividend. We held the gain was properly reported as capital gain.

against the corporate executive but they furnish no grounds for holding the corporation's business is the executive's business.

The separateness of the corporate officer's business and the business of the corporation he represents has long been recognized. *Burnet* v. *Clark*, 287 U.S. 410; *James D. Jarvis*, 32 T.C. 173.

There is an added reason why the Duncan transaction was the sale of a capital asset. In this transaction the property transferred was an option. Respondent's argument ignores the fact that petitioner was the holder of an option executed in 1952 to buy lots from the Duncans until 1956 at $300 apiece, and that he reaped the stipulated gain from the assignment of this option to the development corporation he controlled. Respondent sounds the familiar precept that form should not control over substance and he states that the option feature of the contract was mere form and the substance of the transaction was that petitioner acquired an interest in the land. The difference between an option contract and a contract of sale is one of substance not form. "An option does not pass to the optionee any interest in the land." 5 Thompson, Real Property, sec. 4287h.

Under this contract neither petitioner nor his assignee had any obligation to purchase any of the Duncan land. Petitioner acquired no interest in the Duncan land by the contract and his assignment of the contract to the corporation conveyed nothing more to the corporation than a right to buy lots from the Duncans at $300 a lot within the option periods stated in the contract. No contention is made that petitioner was in the business of acquiring and selling options to customers in the regular course of his business. The record shows this was the only one he ever sold.

Respondent makes an additional argument as to the Schafer transaction with respect to section 1237 of the Internal Revenue Code of 1954, which permits taxpayers qualifying under it to sell subdivided land without all of the gains being treated as ordinary income. Amongst the qualifications are: that the land must have been acquired by inheritance or held by the taxpayer for a period of 5 years. Respondent argues petitioner does not qualify under this statute, therefore he realized ordinary income.

There is no merit in respondent's argument. If, without regard to the statute, the sale of the property would have been regarded as the sale of a capital asset, the statute has no application, regardless of whether the taxpayer could or could not meet the qualifications of the statute. The argument respondent advances seems contrary to his own regulation (sec. 1.1237-1(a)(4), Income Tax Regs.) to the effect that even if a taxpayer could meet the qualifications of the statute "the rules of section 1237 are not applicable if without regard to section 1237 the real property sold would not have been considered real property held primarily for sale to customers in the ordinary course

of his business." The statute is not applicable. See *Estate of William D. Mundy*, 36 T. C. 703.

We hold petitioner correctly reported his gains from the transactions as capital gains.

*Decision will be entered under Rule 50.*