Charles T. Boynton, II v. Commissioner.
Boynton v. Commissioner
Docket No. 4769-66.
United States Tax Court
T.C. Memo 1969-204; 1969 Tax Ct. Memo LEXIS 90; 28 T.C.M. (CCH) 1075; T.C.M. (RIA) 69204; September 30, 1969. Filed *90 Held, that the petitioner was not in the business of buying and selling real estate and that a loss sustained upon the foreclosure of a parcel of real estate which he owned was not an ordinary loss, but was a capital loss which under section 172(d) of the Internal Revenue Code of 1954 was not deductible in computing a claimed net operating loss. Garvin W. Videen, Arizona Land Title Bldg., Tucson, Ariz., for the petitioner. Richard Rink, for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined a deficiency in income tax for the taxable year 1960 in the amount of $22,657.45. The issue for decision is whether the respondent erred in determining that a loss of $46,000 sustained by the petitioner when certain property was foreclosed in 1963 constituted a capital loss which, under section 172(d)(2) of the Internal Revenue Code of 1954, would not be taken into account in computing a net operating loss for the taxable year 1963 for purposes of carryback to the taxable year 1960. Findings of Fact The petitioner filed his Federal income tax returns for the taxable years 1960 and 1963 with the district director of internal revenue, Phoenix, *91 Arizona. At the time the petition herein was filed he was a resident of Hollywood, California. Prior to 1960, the petitioner resided in Chicago, Illinois, where he was engaged in manufacturing paper boxes. In 1960 he moved to Tucson, Arizona, where he purchased a home on September 10, 1960 for $67,500, making a down payment of $35,000. This move was prompted by his interest in buying and selling property in the Tucson area. Fred Potter, an attorney, had also moved from Chicago to Tucson. On or about March 1, 1959, the petitioner and Potter orally agreed to buy and sell such real estate in the Tucson area as they might mutually agree upon. The understanding was that the petitioner would provide the capital, which would draw interest at 6 percent during the time it was invested in property, and upon the sale of the property the gain, after payment of the interest, was to be divided equally between them. They did not anticipate any losses and consequently there was no specific agreement with regard thereto. However, neither of them considered that Potter was obligated to reimburse petitioner for any loss sustained. It was understood that both would engage in the work. The petitioner obtained *92 the capital to be used by selling all the stock he owned. On June 15, 1960, Potter, Milton Wesley and R.A. Schendel entered into a trust agreement with the Arizona Land Title and Trust Company to which they caused to be transferred as trustee certain real property, hereinafter referred to as the Williamson property, in the El Sahuaro Addition to Tucson. The transferors (sellers) were Stanley and Laura Williamson. The Trust Company, as trustee, paid the Williamsons a purchase price of $160,000 which consisted of a down payment of $46,000, the trust company's note for $77,750, secured by a third mortgage on the property, payable at an annual rate of $15,550 plus interest, and the assumption by the trust company of the first and second mortgages on the property in the amounts of $15,000 and $21,250, respectively. The beneficial interests in the trust were stated to be Potter 90 percent, Wesley 5 percent, and Schendel 5 percent. The petitioner furnished the $46,000 down payment and it was understood between him and Potter that they each owned an equal interest in the property. The allocation of 5 percent interests to Wesley and Schendel, who were real estate agents in Tucson, 1076 was *93 made to promote the sale of the property by enabling them to share in the proceeds. The Williamson property bordered on the major 4-lane interstate highway which ran between Phoenix and Tucson. It was located in a business area among various small industrial, wholesale, and retail interests including motels, trailer parks, and restaurants. The property had the highest elevation along that portion of the highway, giving it a view of the surrounding area. When the property was acquired it was already zoned to the satisfaction of the buyers, had been sub-divided, and utilities had been installed up to the property line. The petitioner made inquiry about an access-way for an alley which was held by the city on the property and found that for a fee the city would allow such to be closed off. It was the purpose of petitioner and Potter in acquiring the property to sell it at a profit as soon as possible. Shortly after the purchase the petitioner advertised the property for sale and it was orally listed for sale with the Arizona Land Title and Trust Company which placed a large "For Sale" sign on the property, at its expense. On April 25, 1961, petitioner and Potter gave Schendel a power *94 of attorney to sell their interest in the property, in order that the property could be conveyed or an offer accepted if Potter should be out of town. No selling price was fixed in the power of attorney. There were then some prospective purchasers but none who were satisfactory. It was thought that the property could be sold to a motel company, but as time went on it became apparent that no such company was interested in building there because of the Tucson economy. Thereupon, at a time not disclosed, Potter and petitioner concluded that it would be necessary to make the property more attractive. They contacted James Gremanis who suggested that if a deluxe club and restaurant facility were built on the front portion of the property the remainder could more easily be sold to a motel company because of access to such a facility. He also advised that financing for such a project could be obtained. Some time in 1962 a tentative agreement was reached with an architect, Nicholas Sakellar, who prepared an artist's rendering of a club and restaurant facility. Petitioner and Potter engaged Gremanis to attempt to obtain a commitment for financing for such a project. Gremanis made trips to New *95 York, Boston, Los Angeles, and Seattle for this purpose, and was paid $1,000 by petitioner and Potter. The petitioner and Potter took the architectural rendering to both prospective purchasers and finance companies, hoping thereby to effect a sale of the front portion of the property to one who would undertake such a project. It was not the intention of petitioner and Potter to build or operate this facility themselves. They planned to hold the rear portion of the property for sale to a motel company. Apparently, all these efforts were unsuccessful. No development or improvement was ever made on the property. On August 14, 1962, Schendel and Wesley assigned their beneficial interest in the trust and property to Potter. On April 29, 1963, Potter assigned his entire interest in the trust and property to the petitioner. [1] *96 On January 30, 1963, a mortgage foreclosure action was instituted by the Williamsons against the trustee for failure to make payments on the three mortgages and, after judgment and sheriff's sale, the property was conveyed to the Williamsons by sheriff's deed dated October 11, 1963. The petitioner did not recover any of the $46,000 down payment which he had made. In his income tax return for the taxable year 1963, the petitioner claimed a deduction of $46,000 as a loss upon the foreclosure of the Williamson property on Schedule C, Form 1040, under the *97 category "Losses of business property" and reported a net operating loss of $40,181.27. 1077 He thereupon claimed an overassessment of $24,760.39 for the taxable year 1960 based upon the carryback of the claimed net operating loss for 1963. The respondent tentatively allowed an overassessment of $22,657.45 for 1960. In the notice of deficiency for the taxable year 1960, the respondent determined that no net operating loss was available to the petitioner from 1963 with the explanation that "the business loss claimed on your 1963 return in the amount of $46,000 represents the loss of an interest in a capital asset not connected with your trade or business and is deductible as a capital loss subject to the provisions of Section 1211(b) of the Internal Revenue Code of 1954." The petitioner and Potter together entered into four other transactions, described hereinafter, the tax consequences of which are not in issue herein. Crazy Corner Property: On July 30, 1960, Potter purchased real property known as the Crazy Corner property for $125,000, making a down payment of $35,000 and giving the seller a note for $90,000 secured by a first mortgage, payable at the rate of $30,000 plus interest *98 annually. The petitioner furnished the down payment and he and Potter considered that each owned a one-half interest in the property. It was their intention to sell the property as soon as possible. The property was located on the main thoroughfare through Tucson (an interstate highway). Utilities had been installed up to the property line. There was an abandoned filling station on a portion of the property which was never operated after Potter took title. The petitioner felt that the property was well situated for the construction and operation of a restaurant, which would have been possible under the existing zoning. Shortly after the property was acquired the petitioner and Potter advertised it for sale and listed it for sale with real estate agencies which placed their signs thereon. It was orally listed for sale with Arizona Land Title and Trust Company. On August 1, 1961, Potter conveyed this property to the Arizona Land Title and Trust Company under a trust agreement naming that company as trustee and Potter and his wife as beneficiaries. At the same time the Arizona Land Title and Trust Company as trustee gave its note in the amount of $35,000, secured by a second mortgage *99 on the property, to Alyce T. Williams to secure a loan of $35,000 made by Alyce to Potter, which Potter used to make payments on the underlying obligation to the seller. The petitioner made a trip to the West Coast to interest restaurant chains, including Sambo's, Inc., in the property. By deed dated January 10, 1962, the Arizona Land Title and Trust Company conveyed the Crazy Corner property to Sambo's, Inc., a California corporation, for $135,000. Sambo's, Inc., made a down payment of $25,000, gave its note for $50,000 secured by a second mortgage on the property and assumed the unpaid balance of $60,000 on the first mortgage. The Sambo's, Inc., note for $50,000 was subsequently endorsed to Alyce T. Williams by the trust to satisfy the $35,000 obligation to her. In his income tax return for the taxable year 1962 the petitioner did not report any gain or loss from the sale. In his return for the taxable year 1962 Potter reported a long-term capital gain of $2,143 upon the sale. Kwik-Serv: On May 1, 1960, certain real property in the Linden Park Addition to Tucson, hereinafter referred to as the Car Wash property, was leased to Potter and his wife and T. A. Harney and his wife. The *100 lease was for a term of 15 years with an option to purchase the property for $79,800. In September 1960, the Harneys assigned their interest in the lease to the petitioner and his wife for a recited consideration of "TEN and NO/100 ($10.00) DOLLARS and other valuable considerations." Prior thereto the petitioner had no interest in the property. When petitioner acquired his interest in the lease it was his intention to build a car wash on the property and operate it, and this was done. On February 20, 1961, Kwik-Serv Car Wash, Inc., (hereinafter referred to as Kwik-Serv) was incorporated by the petitioner and Potter under the laws of Arizona. The petitioner and Potter each held a 50 percent interest in Kwik-Serv and served as its officers, the petitioner as president and Potter as secretary. The lease was transferred to the corporation. The option to purchase was exercised by Kwik-Serv on or about April 3, 1961. At the same time Kwik-Serv borrowed $83,000 from The Valley National Bank of Phoenix giving its note in the same amount 1078 to the bank. The note was payable in monthly installments of $723.10 and was secured by a first mortgage on the property. The petitioner and Potter signed *101 such note in their personal capacities as well as their corporate representative capacities. The petitioner directed the bank to pay the purchase price to the seller and to deposit the balance of the loan, less taxes and service charges, to the Kwik-Serv account. An additional borrowing in the amount of $48,308.17 was made by Kwik-Serv from the bank on September 10, 1962, Kwik-Serv giving its note payable in 30 days secured by a second mortgage on the Car Wash property together with a chattel mortgage on its equipment. Again the petitioner and Potter signed the note in their personal and representative capacities. The petitioner and Potter actively operated the car wash for some time. In their returns for the taxable years 1961 and 1962 the petitioner and Potter each reported as compensation from Kwik-Serv the respective amounts of $3,000 and $2,250. While these amounts were accrued on the corporate books, they were not actually paid to petitioner and Potter. In 1963 the petitioner and Potter decided that the operation of the car wash was too time consuming and decided to sell the property, listing it with most of the real estate offices in Tucson, including Arizona Land Title and *102 Trust Company. On April 29, 1963, Potter assigned his interest in Kwik-Serv to the petitioner, as stated in footnote 1, supra. The petitioner transferred all the stock to a third party for the assumption of indebtedness by such third party. In his income tax return for the taxable year 1963 the petitioner claimed a long-term capital loss in the amount of $120,000 on his Kwik-Serv stock, stating that such stock was worthless. This resulted in a reported net long-term capital loss of $119,998.20. Mt. Vista: Mountain Vista Estates, Inc., (hereinafter referred to as Mt. Vista) was incorporated in Illinois on July 22, 1960, and was licensed to do business in Arizona on July 28, 1960. It was formed by several individuals, including the petitioner, for the purpose of purchasing a 560-acre tract of land in Pima County, Arizona. Potter promoted the project and was the president of the corporation. The intention of the individuals was to sell the property as quickly as possible either as raw land or after improvements which would increase its value. The corporate form was utilized for the purpose of limiting the liability of the individuals. The property was purchased on July 22, 1960, for *103 $708,000 under a trust agreement wherein title to the property was held by the Arizona Land Title and Trust Company as trustee with the seller as first beneficiary and Mt. Vista as second beneficiary. Of the $708,000 purchase price, $150,000 was paid by Mt. Vista in cash as a down payment and the remaining $558,000 was payable in annual installments of not less than $30,000 plus interest. Upon payment of the down payment 60 acres were released from the conditions of the trust, and other portions were to be released upon further payments. The trust agreement also gave Mt. Vista the right to improve and develop the property subject to the approval of the seller. The stockholders contributed the $150,000 down payment. The petitioner, who owned 30 percent of the stock of Mt. Vista, and was the largest single shareholder, contributed 30 percent ($45,000) of the down payment. Although Potter did not own any stock, it was understood between him and petitioner that he would share equally with petitioner any profit derived by petitioner, after petitioner had received interest upon his contribution. The 560-acre property was the sole asset of Mt. Vista. It was located in Oracle Valley, a few *104 miles north of Tucson. It was in an area which had a beautiful mountain view, and which was being rapidly developed with houses and golf course. Immediately after the property was acquired by Mt. Vista, the petitioner and Potter made efforts to sell it through personal contacts and by listing it with real estate agencies in the Tucson area, which placed signs on the property and placed newspaper advertisements. The petitioner made a trip to Chicago to try to interest two parties there in the purchase of the property. The petitioner and Potter obtained an agreement from the county to extend a road through the property as it might be developed. The property was zoned for 4-acre residential parcels. They had it rezoned to permit smaller building parcels which, they believed, would enhance the value of the property. No actual subdividing was done and no improvements were made. The petitioner and Potter also tried unsuccessfully to interest various hotel chains to purchase the property for development 1079 as a resort hotel. They had a feasibility report prepared in May 1961 by a hotel accounting firm at the request of Western Hotels, Inc., and Potter made several trips to San Francisco *105 to discuss this possibility with the officers of that company. On April 29, 1963, Potter assigned to the petitioner all his right, title and interest in Mt. Vista as previously stated in footnote 1, supra. The corporation did not hold regular meetings of directors or stockholders. It never made any further payments on the purchase price of the property. In July 1965, it lost its interest in the property as a result of a foreclosure action brought by the sellers. The record does not show whether or when the petitioner ever claimed any loss with respect to his stock in Mt. Vista. Lake Ranch: On or about April 3, 1961, Lake Ranch Mobile Homes Park, Inc., (hereinafter referred to as Lake Ranch) was formed by petitioner, Potter and George Holman for the purposes of purchasing a 27-acre tract of land in Pima County, Arizona. The corporate form was used to limit the liability of the individuals, each of whom owned one-third of the stock. Potter was president and the petitioner was secretary. The property was purchased on April 5, 1961, for $210,000. Lake Ranch made a down payment of $50,000, gave its note for $50,750, secured by a second mortgage on the property, payable at the annual rate *106 of $4,230 plus interest, and assumed a first mortgage on the property in the amount of $109,250, payable at an annual rate of $5,750 plus interest. By oral agreement among the three individuals the $50,000 cash down payment was contributed by Holman; petitioner and Potter were to each later contribute $50,000 at such time as they were able to sell other real estate which they held. Neither the petitioner nor Potter ever made any contribution to the corporation. On April 3, 1961, Lake Ranch also purchased a residence adjoining the 27-acre tract for $18,000, giving its note for $8,289.69, which was payable $4,000 plus interest on June 1, 1961 and the balance on September 1, 1961, and which was secured by a second mortgage on the property, and assuming a first mortgage of $9,710.31, which was payable at the rate of $110.38 per month plus interest. The 27-acre tract included a 2-acre lake and it was the shareholders' opinion that the property would lend itself to use as a trailer park and that if it were developed as such it could be sold at a profit. In December 1961, an architect's layout of the property for use as a trailer park was made. Potter devoted a great deal of his time seeking *107 financing for construction of the park and developing plans to sell the park when improved. Advertisements were placed in the east and west coast editions of the Wall Street Journal offering the property for sale and leaseback as a trailer park, in attempts to obtain financing for construction of a trailer park. Advertisements were also placed in various mobile home trade publications. However, the property was not sold. On April 29, 1963, the petitioner assigned his interest in Lake Ranch to Potter, as previously stated in footnote 1, supra. In his income tax return for the taxable year 1963, the petitioner did not report any gain or loss upon the transfer of his stock in Lake Ranch. At no time did Lake Ranch make any payments on the mortgages and on December 17, 1964, it lost its interest in the property by a foreclosure judgment. As previously stated, the Williamson, Crazy Corner, and Car Wash properties were orally listed for sale with Arizona Land Title and Trust Company, and the petitioner and Potter made frequent inquiry as to the sale prospects. Whenever that company received offers on these properties, Schendel brought them to the attention of petitioner or Potter and discussed *108 such offers with them. Whenever any of the various properties were advertised, other than by real estate firms, prospective purchasers were generally referred to the telephone number and address of Kwik-Serv, but sometimes to the home telephone numbers of the petitioner and Potter. The petitioner and Potter used the Kwik-Serv property as their office for business dealings. The petitioner never personally placed any "For Sale" signs on any of the properties. Such signs were placed by the real estate firms which listed the properties, at their expense. From 1960 through 1963 the petitioner was married to Rosa Boynton. During this time Rosa Boynton held a real estate license and worked for various real estate agencies. Although she had listings on the above properties she did not sell any real estate during the years in question nor did she report any income from her real estate activities. 1080 After the petitioner sold his stock in 1960 (the sales price of which was shown on his 1960 return as $411,406.25), he had no source of income, and from that time through 1963 his living expenses were paid out of his capital and such money as he borrowed. Although in 1960 through 1963 he reported *109 income in varying amounts from the Charles T. Boynton Trust Fund, he did not actually receive such funds since they were paid directly to his first wife and children for alimony and support. In his 1960 and 1961 income tax returns, the petitioner did not state his occupation, but on a financial statement given by him on September 13, 1960, in connection with a loan for construction of the car wash, he stated his occupation as "Investments - Car Wash Owner" and listed among his assets a one-half interest in the Williamson and Crazy Corner properties. In his 1962 income tax return he stated his occupation as "Manager." In Schedule C of his 1963 income tax return, the petitioner showed the business name of C. T. Boynton Real Estate and showed "Real Estate" as his principal business activity. On none of his returns from 1960 through 1963 did he claim any expenses in connection with his real estate activities. The Williamson property was not property held by petitioner in his taxable year 1963 primarily for sale to customers in the ordinary course of his trade or business. Opinion The resolution of the present controversy turns upon the question of whether the Williamson property constituted *110 a capital asset within the definition contained in section 1221 of the Internal Revenue Code of 1954. [2] *111 The petitioner contends that it was not such but was property held primarily for sale to customers in the ordinary course of his trade or business. If the petitioner is correct, the loss of $46,000 which he sustained in 1963 upon foreclosure of such property would constitute an ordinary business loss resulting in a net operating loss for the taxable year 1963 which may be carried back and deducted from income of the taxable year 1960. If, on the other hand, the property was a capital asset, as contended by respondent, the loss sustained would constitute a capital loss and there would be no net operating loss for 1963 to carry back to 1960. Section 172 of the Internal Revenue Code of 1954. [3]
The petitioner calls attention to the principle enunciated in Corn Products Refining Co. v. Commissioner,, 350 U.S. 46, that the definition of a capital asset must be narrowly applied and its exclusions interpreted broadly. *112 The Supreme Court so held stating that this was necessary to effectuate the Congressional purpose, which it stated as follows: Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss. The preferential treatment provided by § 117 applies to transactions in property which are not the normal source of business income. It was intended "to relieve the taxpayer from * * * excessive tax burdens on gains resulting from a conversion of capital investments, and to remove the deterrent effect of those burdens on such conversions." Burnet v. Harmel, 287 U.S. at page 106, 53 S. Ct. at page 75. Since this section is an exception from the normal tax requirements of the Internal Revenue Code, the definition of a capital asset must be narrowly applied and its exclusions interpreted broadly. This is necessary to effectuate the basic congressional purpose. * * * 1081 The question of whether any particular property constitutes a capital asset, or whether it constitutes property held for sale to customers in the ordinary course of a taxpayer's trade or business, is essentially a question of fact *113 to be determined from all the circumstances of a particular case. The courts have set forth a number of factors to be considered, no one of which is necessarily determinative. Among the factors considered are the purpose or reason for the taxpayer's acquisition of the property and his disposition of it, the continuity of sales or sales related activity over a period of time, the number, frequency, substantiality of sales, and the extent to which the owner or his agents engaged in sales activities by developing or improving the property, soliciting customers, and advertising. See W. T. Thrift, Sr., et al., 15 T.C. 366. In the instant case the petitioner, in support of his contention that he was in the business of buying and selling real estate, presented evidence as to 5 properties in which he acquired an interest, direct or indirect, including the Williamson property, pursuant to an oral agreement with Potter to buy and sell such real estate in the Tucson area as they might agree upon. On brief the petitioner refers to Potter as his partner, and apparently considers that there was a partnership between them with respect to the 5 properties. There is no evidence that petitioner and *114 Potter ever filed any partnership returns with respect to these ventures. In any event, the existence or nonexistence of a partnership would not be determinative of the question whether the Williamson property was property held primarily for sale to customers in the ordinary course of a trade or business. Three of the properties which the petitioner contends formed a part of a real estate business conducted by him were owned by corporations in which he held interests. It is well established that the business of a corporation is not to be attributed to its shareholders. Burnet v. Clark, 287 U.S. 410; Higgins v. Smith, 308 U.S. 473; Whipple v. Commissioner, 373 U.S. 193; and Ralph E. Gordy, 36 T.C. 855. Accordingly, it is our opinion that in considering whether the petitioner was engaged in the business of buying and selling real estate there should be considered only two of the transactions described in our Findings of Fact, namely, those involving the Williamson and Crazy Corner properties. It is our conclusion that the petitioner did not hold the Williamson property primarily for sale to customers in the ordinary course of a trade or business within the meaning of section 1221. The *115 purchase of only two properties, and the sale of one and the loss of the other, in a period of over three years, is insufficient to support a conclusion that the petitioner's transactions in real estate were so numerous, frequent, or substantial as to constitute the carrying on of a trade or business. Nor were the activities of petitioner and Potter with respect to such properties of such character as to indicate the carrying on of a trade or business. There was no development or improvement of the two properties by the petitioner and Potter, and it appears that none was ever contemplated. Utilities had already been installed up to the borders of these properties and the petitioner and Potter did not extend them. They did not secure different zoning, nor did they engage in any subdividing. Absent any intention on the part of the petitioner to develop the properties or to engage in any other activity which would serve to enhance their value, it seems apparent that any gain to be expected would result from enhancement in value of the property due to external economic factors. To us this indicates an investment purpose regardless of the length of time the properties might be held. While *116 the petitioner testified that his purpose in acquiring these properties was to sell them at a profit as soon as possible, this does not in itself prove that he was engaged in carrying on a real estate business. As stated in Burkhard v. United States, (C.A. 9) 100 F. 2d 642, there are few, if any, owners of property who will not sell it if a high enough price is offered, and in this sense all property may be held for sale, but this is not inconsistent with the idea that it was purchased as an investment. On brief the petitioner argues that the properties had to be sold within a short time in order to meet the mortgage obligations in regard thereto. This, however, is not inconsistent with an investment purpose. Furthermore, we note that mortgage payments on the properties were due on an annual basis. Indeed, the Williamson property was actually held for over three years without payment on the mortgage before it was lost by foreclosure; and the Crazy Corner property was held for about a year and a half prior to its sale, 1082 during which time money was borrowed to make a payment on the mortgage. The fact that the petitioner himself, and through brokers, made efforts to sell the properties *117 by the placing of signs and contacting prospective buyers, and the fact that he obtained an artist's rendition of possible improvements for presentation to possible purchasers are not in themselves determinative. Such efforts to sell might well be employed either with respect to property held for investment or with respect to property held for sale to customers in the ordinary course of a trade or business. The petitioner testified that he looked to the sale of various properties as his only source of livelihood after he moved to Tucson in 1960. It appears, however, that petitioner and Potter, as officers of Kwik-Serv, actively operated a car wash for some time, albeit it appears that the operation was not successful. It may be added that there is no evidence that the petitioner held himself out as being in the business of buying and selling real estate. Indeed, in a financial statement given by him in September 1960, he characterized his occupation as "Investments - Car Wash Owner," and listed both the Williamson and Crazy Corner properties among his assets. In his 1962 income tax return he characterized his occupation as "Manager." And in April 1963, when he and Potter entered into *118 an agreement by which they dissolved their relationship by mutual transfers of property interests from one to the other, the interests transferred were characterized as interests in "joint venture real estate investments" and "business investments." The foregoing indicates to us that, while petitioner undoubtedly looked to profitable sales of the properties, the return he sought was that of an investor rather than that of one actively engaged in the business of buying and selling real estate. In view of the foregoing, we approve the respondent's determination that the loss of $46,000 sustained by the petitioner upon the foreclosure of the Williamson property in the taxable year 1963 was a capital loss, and that the petitioner is not entitled to deduct for his taxable year 1960 a net loss carryback from the taxable year 1963. Decision will be entered for the respondent. Footnotes
1. This assignment by Potter to the petitioner was pursuant to an agreement entered into on April 29, 1963, whereby he also transferred to petitioner his interest in certain other "joint ventures", which will be discussed hereinafter, namely, his interest in Kwik-Serv and Mt. Vista, in consideration of the transfer to him by the petitioner of the petitioner's interest in Lake Ranch, hereinafter discussed. In such agreement of April 29, 1963, it was recited that "the parties hereto heretofore entered into joint venture real estate investments and business investments in Pima County, Arizona, on a basis whereby Boynton was to receive his capital investment plus six (6%) per cent per annum and thereafter the profits were to be divided equally between the parties hereto" and it was provided that "Each party hereto does hereby release, settle, compromise and discharge the other party hereto from any claims which either party hereto has had * * * arising out of the subject matter of this agreement * * *."
2. Section 1221 provides in part as follows: SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; * * * 3. Section 172 of the Internal Revenue Code provides in part as follows: SEC. 172. NET OPERATING LOSS DEDUCTION. * * * (c) Net Operating Loss Defined. - For purposes of this section, the term "net operating loss" means (for any taxable year ending after December 31, 1953) the excess of the deductions allowed by this chapter over the gross income. Such excess shall be computed with the modifications specified in subsection (d)., (d) Modifications. - The modifications referred to in this section are as follows: * * * (2) Capital gains and losses of taxpayers other than corporations. - In the case of a taxpayer other than a corporation - (A) the amount deductible on account of losses from sales or exchanges of capital assets shall not exceed the amount includible on account of gains from sales or exchanges of capital assets; and * * *↩