HOPE H. GIBSON, JR. and LYNETTE S. GIBSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Gibson v. Commissioner
Docket No. 5808-79.
United States Tax Court
T.C. Memo 1981-240; 1981 Tax Ct. Memo LEXIS 504; 41 T.C.M. (CCH) 1484; T.C.M. (RIA) 81240; May 14, 1981. Hope H. Gibson, Jr., pro se. Willard N. Timm, Jr., for the respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: Respondent determined deficiencies in petitioners' Federal income tax for 1975 and 1976 in the amounts of $ 4,577.95 and $ 4,736.17, respectively. Due to concessions by petitioners, the issues for decision are (1) whether petitioners *505 made substantial improvements that substantially enhanced the value of certain subdivided real property so as to foreclose special capital gains treatment under section 1237, [1](2) whether the subdivided lots were held by petitioners primarily for sale to customers in the ordinary course of their trade or business so as to be excluded from general capital gain treatment under section 1221 and (3) whether petitioners had a basis in the subdivided lots. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation and the exhibits attached thereto are incorporated herein by this reference. Hope H. Gibson, Jr. (hereinafter "petitioner") and Lynette S. Gibson, petitioners in this case, are husband and wife. They resided in Carrollton, Georgia, at the time they filed the petition in this case. Petitioners received 50 acres of land from Lynette Gibson's parents as a gift in June, 1960. The property is located in the vacinity of Carrollton, Georgia. Lynette Gibson's parents had owned the property for *506 approximately 40 years prior to making the gift to their daughter and son-in-law. Petitioner originally tried to develop pastures to raise cattle on the land but determined that he could not make any money from such an undertaking. Since the land was located just outside the city limits of Carrollton and was surrounded by other housing developments, petitioner decided to utilize and sell the land for maximum benefit. Petitioner had never developed real property or held tracts of land for sale and had no experience in construction work. In August, 1970, petitioner submitted his resignation from his job as purchasing agent for Carroll Electric Membership Corporation after 22 years of employment. On December 31, 1970, his resignation became effective. Petitioner then commenced constructing houses on the property received as a gift from his in-laws. Petitioner first constructed a house for his family on part of the property and reserved approximately 25 acres of the land for that purpose. Two blacktop roads were laid across the property to petitioners' residence. During the early 1970's, petitioner subdivided the remaining approximately 25 acres into building lots of between *507 one-half and three-quarters acres each. Houses were built on some of the lots with petitioner entering into contracts for the actual construction work. Petitioner held himself out during the years 1971 to 1976 as a builder of residential homes, doing business as Gibson Realty Development. Houses were built alongside the two blacktop roads, but petitioner retained a three foot frontage of each lot abutting the roads. Water lines were installed on the property by the City of Carrollton at no cost to petitioner and electric and gas lines were installed at no cost. Also, there were no costs relating to sewage disposal on the property since all the lots had septic tanks. Petitioner controlled the size, quality and sales prices of the lots and houses. He had an individual working for him who did most of the actual work with the subcontractors, but petitioner was responsible for purchasing materials and overseeing the development. Petitioner also negotiated with purchasers and attended the closings of sales of the property. His wife, father and father-in-law assisted him in the business without cost. There was no formal advertising of the property for sale and no sales agents *508 or brokers were employed. Potential purchasers were made aware of the development through word-of-mouth advertising. Between 1971, the time petitioner began building and selling houses on the property, and 1976, approximately 31 houses on lots were sold, or about five sales a year. The construction and sale of houses on the subdivided property was petitioner's sole income producing activity for the period from 1971 to 1976. The development was the only source of petitioner's income although his wife was employed full-time elsewhere and he had interest income. In 1975, petitioner sold six of the subdivided lots with residences built on each. In 1976, petitioner sold four of the subdivided lots with residences built on each and another lot with a house built thereon. Petitioners, on their income tax returns, allocated $ 4,000.00 of the amount realized on the sale to each of five lots sold with houses thereon in 1975 and to each of four lots sold with houses thereon in 1976. The returns filed by petitioners divided the real estate sales between Schedule C and Schedule D as follows: 1975
1976
Gross receipts on sales of houses
only Schedule C
$ 169,857.44
$ 108,500.00
Net income on sales of houses
only Schedule C
$ 13,092.94
$ 7,526.16
Gross sales price of 5 (1975) and
4 (1976) building
Lots - Schedule D
$ 20,000.00
$ 16,000.00
Cost of Lots
Long-term capital gain on lots
$ 20,000.00
$ 16,000.00
Profit % of 1959-1960
Sale to Mincey
59.13
62.74
Sale of house to Holland - installment
basis claimed
65.52
30.35
House sold to Don Young
(39,000.00 - 35,764.94)
3,535.06
Long-term capital gain on
1975 & 1976
sales
$ 20,124.65
$ 19,628.15
50% exclusion claimed
10,062.32
9,814.07
Net capital gain reported on
1975 & 1976 sales
10,062.33
9,814.08
*509 Thus, the net profit from the sale of houses constructed by petitioner was reported as ordinary income on Schedule C of petitioners' returns for 1975 and 1976. The net profit from the sale of the lots upon which the houses were built was reported as long-term capital gain on Schedule D of petitioners' returns for the same years. An exception to petitioners' method of reporting concerns the house portion of sales to Holland and Young which were reported as long-term capital gains since they involved installment payments to petitioner. Petitioner sold one of the subdivided lots and a residence to Elwood Holland on October 3, 1975, for $ 36,662.50. The house had been completed on February 1, 1975, at a cost of $ 30,110.74. Petitioner financed the sale of the house to Holland by the use of the installment basis for a period of 300 months. The profit was computed at 18 percent per year on the total profit of $ 6,551.76, [2] resulting in an amount reportable as a profit for the three months remaining in 1975 of $ 65.52 and for 1976 of $ 30.35. Petitioner reported these profits as long-term capital gains in 1975 and 1976. *510 Petitioner, in addition to the subdivided lots and residences sold in 1976, sold a house and lot to Don Young for $ 39,300.00 on November 26, 1976. On petitioners' return it was reported that this house was acquired on March 2, 1975, at a cost of $ 35,764.94, resulting in a profit of $ 3,535.06 [3] which was reported by petitioners as long-term capital gain in 1976. Petitioners expended $ 332.80 in 1975 and $ 316.16 in 1976 for sales tax. OPINION The main issue in this case is whether the gain from the sale of certain subdivided lots upon which houses had been built should be taxed as ordinary income or long-term capital gain. Petitioners received 50 acres of land as a gift from Mrs. Gibson's parents. In 1970, petitioner resigned from his job and commenced constructing houses on the property, holding himself out as Gibson Realty Development. Twenty-five acres were retained for his family and the other 25 acres of the property were subdivided into one-half to three-quarters acres *511 each. Approximately five lots with houses built on each were sold during each of the years from 1971 to 1976. Paved roads, water lines, electric lines and gas lines were installed on the property. In his statutory notice of deficiency to petitioners, respondent explained his adjustments to the returned sales income as follows: (a) The amount of $ 20,000.00 from the sale of five (5) lots and $ 65.52 from the sale of a house to E. Holland reported on your 1975 tax return as long-term capital gains, and the amounts of $ 16,000.00 from the sale of four lots, $ 30.35 and $ 3,535.06 from the sales of houses to E. Holland and D. Young, respectively, reported as long-term capital gains on your 1976 tax return are determined to be ordinary income. See adjustment (b) below. Accordingly, your income is reduced by the amounts reported as long-term capital gain, $ 10,032.76 for 1975 and $ 9.782.71 for 1976, as computed below. 1975
1976
Sales claimed on tax returns
as long-term capital gains: Building lots
$ 20,000.00 $ 16,000.00 Installment Sale of Houses
T. W. Mincey
59.13 62.74 E. Holland
65.52 30.35 D. Young
3,535.06 Net long-term capital gains
per return
$ 20,124.65 $ 19,628.15 Less: Gains determined to be
ordinary income
(20,065.52)
(19,565.41)
Net long-term capital gains,
as revised
$ 59.13 $ 62.74 Less: Section 1202
deduction
(29.56)
(31.37)
Gain to be included in income
$ 29.57 $ 31.37 Gain included in income, per
return
10,062.33 9,814.08 Decrease in Capital gains
$ 10,032.76 $ 9,782.71 *512 (b) It is determined that the amounts of $ 20,065.52 for 1975 and $ 19,565.41 for 1976, resulting from the sale or other disposition of property, represent ordinary income, and not long-term capital gains as explained in (a) above. Accordingly, your income for 1975 and 1976 is increased $ 20,065.52 and $ 19,565.41, respectively. In determining whether petitioners should receive ordinary income or capital gain treatment on the gains realized from sales of subdivided lots, the basic issue in this case is whether the lots constitute property held by petitioner primarily for sale to customers in the ordinary course of his trade or business. Section 1221(1). Section 1237 is a special capital gains provision applying only to limited real estate transactions. If all of its conditions are met, then the subdivided lots are deemed not to be held primarily for sale to customers in the ordinary course of business and capital gain treatment results. However, section 1237 is not exclusive in its application. See section 1.1237-1(a)(4)(i), Income Tax Regs. Failure *513 to qualify under section 1237 does not necessarily mean that the taxpayer held the property primarily for sale in the ordinary course of his business which would then have to be determined under section 1221(1). Gordy v. Commissioner, 36 T.C. 855, 860 (1961). In order to qualify under section 1237, the taxpayer must satisfy three basic conditions: (1) he cannot previously have held any part of the subdivided tract for sale in the ordinary course of his business, nor may he hold in the year of sale any other real property for sale to customers, (2) he cannot make substantial improvements on the tract which increased the value of the lot sold substantially and (3) he must have held the property for at least five years unless he inherited it. Section 1237(a), section 1.1237-1(a)(5) Income Tax Regs.
Focusing on the second condition, certain improvements are specifically declared substantial such as residential buildings and the installation of hard surface roads or utilities such as sewers, water, gas, or electric lines. Pointer v. Commissioner, 48 T.C. 906 (1967), affd. 419 F.2d 213 (9th Cir. 1969). *514 Section 1.1237-1(c)(4), Income Tax Regs.; S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. 591) 83rd Cong., 2nd Sess., p.442 (1954). Here, there can be no doubt that petitioner's developmental activities with respect to the lots were substantial. Furthermore, it cannot seriously be questioned that the construction of houses and hard surface roads on the lots substantially increased the value of the lots themselves. Since the improvements made by petitioner on the subdivided lots must be considered substantial and because they substantially enhanced the value of the lots, we need not consider the other conditions under section 1237. We hold that petitioners have failed to qualify under the provisions of section 1237. The next issue is whether or not the lots were capital assets in petitioner's hands as defined in section 1221(1). Petitioner contends that the property received as a gift from his wife's parents was held by him as an investment. He first attempted to raise grazing pastures but then subdivided the property and sold lots with houses built thereon since this was the most efficient method of liquidating his investment property to realize *515 a profit. Respondent emphasizes that petitioner was actively engaged in subdividing and developing the property, constructing houses on the lots and pricing and selling the lots during the years in issue. Under the definition provided in section 1221(1), the term "capital asset" does not include property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. Whether or not the subdivided lots at issue fit within this definition is a factual question. Thompson v. Commissioner, 322 F.2d 122, 127 (5th Cir. 1963), affg. on this issue 38 T.C. 153 (1962). McManus v. Commissioner, 65 T.C. 197, 211 (1975), affd. 583 F.2d 443 (9th Cir. 1978). Necessarily, each case turns upon its own particular facts; no one circumstance or factor is controlling. The ultimate question is the purpose for which the property is hled at the time of sale. As used in section 1221, "primarily" means "of first importance" or "principally" and not merely a substantial purpose. Malat v. Riddell, 383 U.S. 569, 572 (1966). *516 In addition, section 1221(1) differentiates between gain derived from the everyday operations of a business and gain derived from assets that have appreciated in value over a substantial period of time. Malat v. Riddell, supra; Bynum v. Commissioner, 46 T.C. 295, 302 (1966) (concurring opinion of Judge Tannenwald). Factors most often considered in making this determination include (1) the nature and purpose of the acquisition of the property and the duration of ownership; (2) the extent and nature of the taxpayer's efforts to sell the property; (3) the number, extent, continuity and substantiality of the sales; (4) the extent of subdividing, developing and advertising to increase sales; (5) the use of a business sales office; (6) the character and degree of control exercised by the taxpayer over any sales agent; and (7) the time and effort the taxpayer habitually devoted to the sales. United States v. Winthrop, 417 F.2d 905, 910 (5th Cir. 1969); McManus v. Commissioner,supra at 211. After carefully reviewing the evidence, we find that the lots sold by petitioner during the years in issue were held *517 primarily for sale in the ordinary course of his business. While petitioner's initial purpose for holding the property was to provide pastures for cattle, that purpose changed in the early 1970's. Petitioner then resigned from his job and exclusively devoted his time and energy to the residential development of his property. He was actively engaged in the subdivision of his land and entered into contracts for the construction of houses upon the subdivided lots. He had paved roads and water, gas and electric lines installed on the property. He controlled the size, quality and sales price of the houses and lots. He negotiated with purchasers and attended the closings. In general, petitioner was in the business of developing and selling his property for residential use and he oversaw all aspects of the development. Indeed, he did business under the name Gibson Realty Development. The evidence clearly shows that petitioner's developmental activities and sales of lots with houses built thereon were frequent, substantial and continuous. The construction and sale of houses on the subdivided property was petitioner's sole income producing activity from 1971 to 1976. He sold approximately *518 five houses a year during each of these years. The lots constitute an inherent part of his residential development enterprise and they cannot be viewed separately for purposes of the tax treatment of the gain under the circumstances of this case. The development of the lots and the construction of houses on these lots was undertaken in an overall scheme to sell residential properties. Therefore, neither the houses nor the lots were capital assets in petitioner's hand. We hold that during the years in issue the gain from the sale of subdivided lots upon which houses had been built must be taxed at the same rate as the gain from the sale of the houses themselves, that is, as ordinary income. The remaining issue for decision is whether petitioners had a basis in the subdivided lots. Petitioners raised this issue for the first time on brief, even though they stipulated that their basis in the lots was zero. Furthermore, petitioners on their 1975 and 1976 income tax returns reported that the basis in the lots for purposes of computing gain was zero. The burden of proof is on petitioners to *519 establish their basis in the lots. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142, Tax Court Rules of Practice and Procedure. Since petitioners failed to produce any evidence as to their basis in the property, we sustain respondent's determination on this issue. Decision will be entered for respondent. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, unless otherwise specifically indicated.↩
2. The parties stipulated that the total profit on this sale was $ 6,515.76 but the proper amount is as stated above when petitioner's cost is subtracted from the amount received on the sale.↩
3. The parties stipulated that the profit on this sale was $ 3,535.05 but the proper amount is as stated above when petitioner's cost is subtracted from the amount received on the sale.↩