John NADALIN and Mary Nadalin
v.
The UNITED STATES.
No. 344–60.

United States Court of Claims.
July 15, 1966.

Roger K. Powell, Columbus, Ohio, attorney of record, for plaintiff.  W. S. Pealer, Columbus, of counsel.

Saylor L. Levitz, Washington, D. C., with whom was Asst. Atty. Gen. Mitchell

Rogovin, for defendant. Richard M. Roberts, Lyle M. Turner and Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, WHITAKER, Senior Judge, and DURFEE, DAVIS, and COLLINS, Judges.

## OPINION

PER CURIAM.

This case was referred to Trial Commissioner Saul Richard Gamer with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on March 25, 1965. Exceptions to the commissioner's report and opinion were filed by plaintiffs and the case was submitted to the court on the briefs of the parties and oral argument of counsel. Since the court is in agreement with the opinion, findings and recommendation of the commissioner, it hereby adopts the same as the basis for its judgment in this case, as hereinafter set forth. The commissioner's opinion is in accord with the recent decision of the Supreme Court in Malat v. Riddell, 383 U.S. 569, 86 S.Ct. 1030, 16 L.Ed.2d 102 (1966), as well as with the decisions of this court in Browne v. United States, 356 F.2d 546, 174 Ct.Cl. —— (February 1966), and Tibbals v. United States, 362 F.2d 266, 176 Ct.Cl. —— (June 1966). Plaintiff is therefore not entitled to recover and the petition is dismissed.

## OPINION OF COMMISSIONER *

GAMER, Commissioner:

The question here presented is whether the gain realized by plaintiff [1] in 1956 from the sale of certain lots in two subdivisions constituted long-term capital gain resulting from the sale of a capital asset, or ordinary income resulting from the sale of "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." (26 U.S.C. § 1221 (1958 ed.))

In 1955, plaintiff, then a general contractor for some 35 years, was the owner of 33 acres of unimproved land in Upper Arlington, Ohio, a city located on the outskirts of Columbus, Ohio. This acreage had been assembled from 5 acres purchased as long ago as 1943, 6 adjoining acres in 1944, and 22 also adjoining acres in 1955.

At least from the time plaintiff took title to the 22 acres in April 1955, it is plain that he intended to subdivide the entire 33 acres with a view to effecting a profitable disposition, at the earliest favorable opportunity, of the approximately 100 residential lots that would be contained therein. Indeed, some 6 months earlier, at a time when he owned only 11 acres, he already began appearing before the City Planning Commission to seek preliminary approval of a plat he proposed to develop. Appearances were made in October and November 1954. At that time only a small part of this 11-acre tract, consisting of six lots, had sewer connections, and it was the only part that could be profitably subdivided. Around that same time, however, plaintiff arrived at an understanding with one Spires, the neighbor-owner of the 22 acres, for the purchase of this tract at an agreed price ($2,000) per acre. The preliminary sketch which had been prepared by an engineer employed by plaintiff and submitted to the Planning Commission had already included the Spires' tract. Although plaintiff was not at that time the record owner of the 22-acre tract, it was necessary, in order to obtain the requested preliminary approval for the development of the 11-acre tract, to show the effects of the proposed development on the area as a whole, including how the proposed streets would tie in with existing adjacent streets. At about this time, plaintiff gave a real estate development

---

* The opinion, findings of fact and recommended conclusion of law are submitted under the order of reference and Rule 45(a), now Rule 57(a).

1. Plaintiffs are husband and wife. Mrs. Nadalin is a party only because she filed a joint return with her husband. "Plaintiff" will be used herein to refer to John Nadalin.

company an option to purchase the six more readily marketable lots with available sewer facilities.

Plaintiff took title to the Spires' 22-acre tract on April 28, 1955, and the very next day employed an engineering firm to prepare another preliminary subdivision plat relating to the entire 33 acres, showing its boundaries, the adjoining lots and subdivisions, and a proposed layout of the streets to be built within the subdivision. By that time it had become obvious that the entire 33 acres could be profitably subdivided. A few months earlier, the city had acquired land for a new high school in the vicinity of the 33 acres and around 2 weeks earlier, the city had, on April 11, 1955, adopted a resolution for the construction of a sewerline that would effectively serve the entire 33 acres.

Two subdivisions were platted from the 33 acres. One, called "Windsor Place Addition," consisted only of the six lots in the original 11-acre tract which already had access to sewage facilities and which were under sale option. The other, called "Windsor Place Addition Extension No. 1," consisted of the remainder of the property. In June 1955, the Planning Commission tentatively approved the plat and plaintiff thereupon authorized the engineering firm to proceed with the preparation of the final plats and the making of the necessary surveys. In October, plaintiff appeared before the Commission and obtained approval of the final plat for the six-lot Windsor Place Addition. The following month plaintiff dedicated property to the city for the improvement of a road on the northern boundary of the 22-acre tract and, in addition, granted an easement along the boundary for the sewer, which was in fact constructed shortly thereafter.

Up to this time, it would seem indisputable that plaintiff was fully intending and preparing to engage in a lot selling business activity in the two subdivisions he had created. The time was ripe therefor and all of his activities were certainly pointing in this direction.

However, plaintiff contends that at about this time he abandoned any such ideas that he might have had and instead decided to dispose of substantially the entire acreage in one transaction. This is essentially the basis for plaintiff's capital gain contention. It is grounded upon the following events:

Sometime around the middle of 1955 one Jones, a local realtor, learned of plaintiff's recent acquisition of the 22-acre tract. Recognizing the potential for profitable development of plaintiff's entire 33 acres, he approached plaintiff and discussed development plans of possible mutual benefit. Jones' major problem was lack of capital. He himself, therefore, could neither purchase lots nor invest funds in their development. Without making any substantial investment himself, he could nevertheless participate in the development venture through commissions resulting from the sale of houses to be built on the lots. For this purpose, however, he would have to have sufficient control so as to effect an exclusive right to sell the houses. He convinced plaintiff that he would be able to find homebuilders who would be willing to purchase the lots at an attractive improved property price, provided plaintiff would take just a small downpayment and then wait for the balance until the improvements were all installed and the houses were built and sold. Plaintiff would have the builder's note and mortgage to secure the balance. Since the entire area would have to be developed with the usual subdivision improvements, such as streets, waterlines, sewers, and sidewalks, and since the price of the lots would be fixed as for improved property, the cost of such improvements (or the payment of assessments therefor) would also have to be defrayed by plaintiff. However, this could be done in the form of a deduction from or adjustment to the sales price of the lot which would similarly be made when the house would be sold and the builder would pay the balance due on the lot. In the meantime, the builders, operating through construction loans, would advance the necessary funds

therefor as part of their construction operations.

Plaintiff finally was persuaded to work out an arrangement with Jones along such lines. The advantage to plaintiff was that, without having to pay any commissions, he would not have to be concerned with seeking buyers for the lots and would be relieved of many of the details concerning the installation of the improvements. Jones and the builders would tend to these matters. He would still be able, however, to obtain a very satisfactory price for his lots on an improved property basis. All he would have to do would be to consent to defer the payment of the bulk of the sales price of the lots until the houses were erected and Jones was able to sell them. And the builder's note and mortgage for such balance would be quite adequate security, even with the subordination thereof to the first liens which the builder's financing institutions would necessarily require on their construction loans. The advantage to Jones was, of course, that, provided he could find builders who would buy the lots, make initial outlays for improvements, and build the houses, and provided also that he could sell the houses, he would be able, on his exclusive agency basis, to earn substantial commissions and thus share in the fruits of the development with little investment.

To give Jones the control required to effect an exclusive sales agency, the lots would have to be conveyed to the builders through Jones as owner. It was therefore agreed that, as Jones found builder-buyers for the lots who would be willing to operate on the proposed basis, he would take a downpayment of $500 per lot. Jones would then turn such payment over to plaintiff, who would thereupon execute a deed to the lot to Jones, and receive from Jones a note and mortgage for the balance due. Jones would then convey the lot to the builder-buyer, receive the buyer's note and mortgage for the balance, and assign the note and mortgage to plaintiff (in substitution for Jones' note and mortgage).

The price of the lots was fixed at $55 per front foot less the costs of improvements. Since this represented the full market price, it was understood that, as a practical matter, there was little, if any, room for Jones to realize any profit on the resale to the builder and that he would, therefore, sell the lots to the builders at the identical price. As stated, his source of income from the venture would be the commissions on the ultimate sales of the houses.

As Jones had first to find builders who were willing to buy the lots before he himself could purchase them from plaintiff, it was agreed that their relationship would be in the form of options to be exercised by Jones. When he found a builder who would be willing to purchase a lot for $500 down, he would exercise an option, purchase the lot, sell the lot to the builder under an exclusive agency arrangement, turn the $500 over to plaintiff, and assign to plaintiff the builder's note and mortgage for the balance of the lot price (the full price of the lots averaged around $4,100). However, even prior to arriving at their final agreement Jones already had commitments for 28 lots, which certainly was sufficient to set the venture off to a flying start.

On November 14, 1955, plaintiff and Jones entered into an agreement with respect to Windsor Place Addition Extension No. 1 which was designed to formalize the above-described arrangements. It recited and provided, among other things, that the subdivision "is in the course of being platted"; that it would "consist of approximately 97 lots"; that, when the proceedings for the platting of the lots would be completed, plaintiff agreed to sell to Jones 28 lots for $14,000 down (28 × $500 per lot), the balance (stated as $108,100) to be determined on the basis of $55 per front foot, but reduced by the cost of the improvements; that the balance due on each lot would be evidenced by a note and mortgage, "which mortgage shall contain a provision waiving any and all priority in favor of a lending institution granting loans for construction purposes upon the

premises"; that plaintiff agreed to sign all papers necessary "for the completion of the plotting and dedicating of the streets"; that the sale of the 28 lots would be closed 10 days after the completion by the city of the water, sanitary and storm sewer, street and curb improvements with respect to the lots, at which time plaintiff would furnish 28 abstracts of title; and further, that plaintiff gave Jones "the exclusive privilege and option to purchase all of the remaining premises" in the subdivision at the same price and on the same terms and conditions provided at least 20 lots per year were purchased. Thereafter, Jones organized a corporation, the Northwest Real Estate Company, to carry out his part of the operations.

In March 1956, plaintiff appeared before the Planning Commission and obtained approval of the final plat for this subdivision.

In April 1956, plaintiff conveyed the six lots constituting the Windsor Place Addition to the development company which had the option thereon, and in June 1956, he conveyed to Jones' corporation the 28 lots covered by their agreement. Prior thereto, Jones and five builders had worked out extensive plans to develop the subdivision, and had held many meetings in connection therewith. Plaintiff took no part in such activities.

During the following year of 1957, 28 additional lots were conveyed by plaintiff to Jones' corporation for reconveyance to the builders. However, although the original builders thereafter (due principally to slower than expected sales) failed to take any further lots, Jones was nevertheless able to secure another local builder, Richard Slabaugh, to continue to develop the subdivision. In 1958, Slabaugh took 17 lots. Plaintiff conveyed the lots to Jones' company, which in turn reconveyed them to Slabaugh. However, in 1959 Jones was able to dispose of only 11 lots, 10 to Slabaugh.[2]

At about this time, Jones went out of business and assigned his contract with plaintiff to Slabaugh. Eight of the remaining nine lots in the subdivision were then conveyed directly by plaintiff to Slabaugh upon the same terms, i.e., $500 down, and the balance upon completion and sale of the house. As of 1963, one lot still remained unsold.

Under these facts, it is difficult indeed to accept plaintiff's contention that his arrangement and contract with Jones effected a "sale" or disposition of all of his interests in the Windsor Place Addition Extension No. 1 Subdivision, thereby evidencing his intention of terminating any lot selling business activity. The reality of the situation was that Jones was simply finding buyers for plaintiff's lots. Although Jones was the go-between, the transaction in essence was between plaintiff and the builders, as it had to be, because of Jones' lack of capital. Jones simply turned the $500 downpayments over to plaintiff, and then assigned to plaintiff the builder's notes and mortgages for the balance due, at plaintiff's sales price. Jones was in effect nothing more than an agent on these lot sales transactions. The correctness of this analysis is emphasized by the fact that, when Jones did drop out of the picture, the sales continued to be made but directly to the builder then operating, upon the same terms and prices, and with the builder's note and mortgage going straight to plaintiff.

■ Although the agreement with Jones spoke in terms of a "sale" of 28 lots, it did so only because, at the time of the agreement, Jones already had commitments for such number of lots. Jones did not have sufficient funds to buy a number of lots, let alone 28. As to the balance of the lots for which Jones then had no buyers, the agreement spoke only of "options." But the whole venture was, obviously, basically nothing more than an "option" one, as it had to be due to Jones' lack of capital. As was said in

2. Manifestly, plaintiff did not insist on strict observance of the contract provision that at least 20 lots a year be purchased.

Doll v. Commissioner of Internal Revenue, 149 F.2d 239 (8th Cir. 1945), cert. denied, 326 U.S. 725, 66 S.Ct. 30, 90 L.Ed. 430: "Substance and not form controls in applying income tax statutes and 'the realities of the taxpayer's economic interest, rather than the niceties of the conveyancer's art, should determine the power to tax.' Helvering v. Safe Deposit & Trust Co. of Baltimore, 316 U.S. 56, 58, 62 S.Ct. 925, 86 L.Ed. 1266 * * *." (at 149 F.2d 243.) The substance of the transaction indicated at most a bare transfer of legal title to Jones' corporation upon the exercise of an option, with no intent that the corporation would itself exercise any of the real incidents of ownership. Real estate options in and of themselves do not, of course, constitute sales. "The difference between an option contract and a contract of sale is one of substance not form. 'An option does not pass to the optionee any interest in the land.' 5 Thompson, Real Property, sec. 4287h." Gordy v. Commissioner, 36 T.C. 855, 860 (1961). Thus, plaintiff's contention that, despite the substantial number of lot sales he made in the years subsequent thereto, he effectively disposed of all of his interests in the subdivision by the Jones' 1955 contract, cannot be accepted.

It is true that after his agreement with Jones, plaintiff's part in the development program became a relatively passive one. Jones—at least as long as he remained a part of the venture—found the builder-buyers for the lots, and Jones and the builders thereafter advertised, promoted, and built the development. But despite his physical passivity, plaintiff in fact had a substantial stake in this entire business speculation. By deferring the balance due on his lots until the sale of the houses, he not only made it possible for the development to proceed, but he also had a vital interest in its success. Further, by subordinating his mortgages to those of the financing institutions, he made it possible for the builders to obtain construction loans. And since it was plaintiff who was paying for the installation of the various street and utility improvements, he certainly had a real financial interest in at least this part of the enterprise.

Indeed, as to the improvements, plaintiff's role was not so passive. After the Jones' contract of November 14, 1955, and the approval by the Planning Commission in March 1956 of the final plat for the subdivision, plaintiff in May 1956 authorized his engineers to proceed with certain improvements and conferred with them as to the various details of their installation. In July 1956, he authorized them to proceed with plans for additional street, water, curb, gutter and sewer improvements. He appeared, as necessary, before the City Council and the City Planning Commission concerning the improvements, and executed such papers as were required in connection with the performance of the work. In 1956, the tax year here in question, plaintiff's tax return showed expenditures for improvements of approximately $50,000. For the entire subdivision, plaintiff, throughout the years, spent almost $190,000 for such improvements, and almost $6,000 for engineering costs.

In a similar situation, where an owner of unimproved property gave a real estate developer an option to sell all the lots in his acreage at a fixed price, the title passing from the owner to the purchaser as each lot was sold, the court, in sustaining an ordinary income assessment, characterized the transaction as either in the nature of a joint venture or an agency. Bauschard v. Commissioner of Internal Revenue, 279 F.2d 115 (6th Cir. 1960). The joint venture characterization would appear to be even more appropriate in the instant case since in *Bauschard* it was the developer and not the owner who platted, subdivided and improved the property at his own expense. Here it was plaintiff who defrayed all of these expenses.

In emphasizing plaintiff's passivity in the actual lot selling activity, as well as in the advertising, promotion, and house selling aspects of the venture, plaintiff points to certain cases in which owners of subdivision lots who continuously dis-

posed of them in substantial numbers on an individual lot basis through an independent real estate broker handling all the details were nevertheless held to have realized capital gains. However, these cases are for the most part of the "liquidation" variety. For instance, one who inherits property and wishes to dispose of it but finds he cannot readily do so in one bulk transaction may give a real estate agent or developer broad authority to subdivide and improve it as the only practical way to effect a disposition. In such an instance, the mere execution by an owner of a series of deeds to individual lots as an incident to a sale of the entire tract will not alone necessarily serve to deprive him of capital gains treatment. Estate of Mundy v. Commissioner, 36 T.C. 703 (1961); Smith v. Dunn, 224 F.2d 353 (5th Cir. 1955); Gordon v. United States, 159 F.Supp. 360, 141 Ct.Cl. 883 (1958); McConkey v. United States, 130 F.Supp. 621, 131 Ct. Cl. 690 (1955). And this result may follow even though the heirs liquidate their inheritance themselves, without the aid of a real estate broker or developer. Garrett v. United States, 120 F.Supp. 193, 128 Ct.Cl. 100 (1954). The same capital gain treatment may also result from the sale of subdivided realty in other similar "liquidation" situations, such as those arising out of the necessity to raise funds to satisfy other business needs (Lazarus v. United States, 172 F. Supp. 421, 145 Ct.Cl. 541 (1959)), or as an incident of a reorganization (Western & Southern Life Ins. Co. v. United States, 143 Ct.Cl. 460, 163 F.Supp. 827 (1958)), insolvency (Cebrian v. United States, 181 F.Supp. 412, 149 Ct.Cl. 357 (1960)), the normal winding up of a phase of a business operation (Chandler v. United States, 226 F.2d 403 (7th Cir. 1955); Curtis Co. v. Commissioner, 232 F.2d 167 (3rd Cir. 1956); Oahu Sugar Co. v. United States, 300 F.2d 773, 156 Ct.Cl.

546 (1962)), or the inability, despite repeated efforts, to dispose of investment property en bloc (Fahs v. Crawford, 161 F.2d 315 (5th Cir. 1947); Voss v. United States, 329 F.2d 164 (7th Cir. 1964)).

But this is not our situation. Plaintiff was not liquidating inherited or unwanted property which he found he could not dispose of in the form of unimproved acreage. Clearly, plaintiff, as a good business proposition, intended to subdivide his 33 acres, improve it, and realize the large profits that would result therefrom, as is shown by his subdivision activities even before his purchase of the Spires' tract, and his action the day immediately after such purchase, after the city just 2 weeks earlier had decided to put in a sewerline which would serve the entire property, of setting the machinery in motion to subdivide it. Despite the intervention of the Jones' 1955 contract, plaintiff's intentions were fully carried out by his sales in the years 1956–59 of 90 lots.[3]

While in the "liquidation" situations, emphasis has, in considering whether the owner is to be treated as conducting a business activity, frequently been placed upon the owner's inactivity and the fact that all of the subdivision promotion and sales activities were handled by an independent broker with broad delegations of authority, nevertheless in the non-liquidation situation it has been repeatedly recognized that "A taxpayer may engage in business through an agent, and the sales activities of an agent for the benefit of the principal will be imputed to the principal." Bauschard v. Commissioner of Internal Revenue, supra, 279 F.2d p. 118. In Achong v. Commissioner of Internal Revenue, 246 F.2d 445 (9th Cir. 1957), too, the taxpayer entered into an agreement with a real estate broker whereby the broker would subdivide and sell the property, the taxpayer would reimburse the broker for the cost of the im-

---

3. In 1956, plaintiff sold the six Windsor Place Addition lots plus 28 lots from Windsor Place Addition Extension No. 1. In 1957, from the extension subdivision, plaintiff sold 28 more, in 1958, 17, and in 1959, 11, totaling 90 lots in the 4 years. There were then only 9 lots left in the extension, 3 of which were sold in 1960, 2 in 1961, and 3 in 1962, leaving one unsold.

provements and the surveying, and the broker would have an exclusive agency to sell the lots to homeseekers. Overruling the contention that the taxpayer should be entitled to capital gains treatment on the sales of the lots because he was not active in promoting the sales and because the broker allegedly acted as an independent contractor, the court held "* * * a person may be engaged in business within the meaning of this section [of the Internal Revenue Code] through agents." (p. 447.) To the same effect are Gamble v. Commissioner of Internal Revenue, 242 F.2d 586 (5th Cir. 1957); Snell v. Commissioner of Internal Revenue, 97 F.2d 891 (5th Cir. 1938); Boeing v. United States, 168 F.Supp. 762, 144 Ct.Cl. 75 (1958); and Miller v. United States, 339 F.2d 661, 168 Ct.Cl. 498 (1964).

Indeed, even in an inheritance-liquidation situation, with sales conducted through a broker, continuing, substantial and frequent sales of property that is subdivided and improved to attract purchasers, has been held to result in gain taxable as ordinary income. Brown v. Commissioner of Internal Revenue, 143 F.2d 468 (5th Cir. 1944). And the same result followed in a business liquidation where an attempt to sell large acreage en bloc failed and the owners found they had to subdivide in order to dispose of their holdings. The court held that although they were not in the real estate business by choice, nevertheless their continuous, substantial and frequent sales necessarily resulted in their disposing of their property in the ordinary course of trade or business. Palos Verdes Corp. v. United States, 201 F.2d 256 (9th Cir. 1952). To the same effect are Boeing v. United States, supra, and Rollingwood Corp. v. Commissioner of Internal Revenue, 190 F.2d 263 (9th Cir. 1951), where the frequency and continuity of the sales transactions were again stressed.

To support his contention that he was merely buying and selling investment property and not engaging in a business, plaintiff points to his long tenure of the 11 acres, which he had used as an orchard and vineyard, his desire over the years to acquire the Spires' tract, which was simply planted in corn, and his commitment to purchase the tract months before the city made the important decision to build the sewerline to the area. However, while in such cases the purpose for which the property was originally acquired is certainly a relevant factor for consideration, Fahs v. Crawford, supra; Voss v. United States, supra, it is nevertheless, recognized that of far greater weight is the purpose for which the property was held at the time the decision to subdivide was made. Miller v. United States, supra; Bauschard v. Commissioner of Internal Revenue, supra; Mauldin v. Commissioner of Internal Revenue, 195 F.2d 714 (10th Cir. 1952); Rollingwood Corp. v. Commissioner of Internal Revenue, supra. "The statute uses the express words 'property *held* by the taxpayer.'" Bauschard v. Commissioner of Internal Revenue, supra, 279 F.2d p. 118. The purpose of holding may well change over the years. Cohn v. Commissioner of Internal Revenue, 226 F.2d 22 (9th Cir. 1955). Certainly, regardless of what plaintiff originally had in mind when he first became interested in his tracts, his holding purpose became quite clear when he began taking active steps looking to a profitable subdivision when the city did decide to build the sewerline.

Plaintiff further emphasizes the fact that his "business" over the years was that of a general contractor specializing in the construction of schools and hospitals. He was not, he says, in the real estate business as such and was simply an investor in real property, as certain earlier isolated transactions indicated. While it is, of course, relevant on the "investment" aspect of real estate holdings to inquire into a person's normal business or professional activity, Lazarus v. United States, supra; Voss v. United States, supra, it is, nevertheless, well recognized that one may be in more than one business at the same time. Gamble v. Commissioner of Internal Revenue, supra; Mauldin v. Commissioner of Internal Revenue, supra; Snell v. Commis-

sioner of Internal Revenue, supra. For instance, the activity of selling subdivided realty, where the sales are not isolated but are continuing, substantial, and frequent, has been held to constitute a "business" even though the owner was a lawyer (Gamble v. Commissioner of Internal Revenue, supra), a priest (Bauschard v. Commissioner of Internal Revenue, supra), a golf course operator (Snell v. Commissioner of Internal Revenue, supra), a county commissioner (Thompson v. United States, 145 F.Supp. 534, 136 Ct.Cl. 671 (1956)), or a cashier (Achong v. Commissioner of Internal Revenue, supra). "The fact that petitioner had other full time employment does not prevent him from being in the real estate business." Achong v. Commissioner of Internal Revenue, supra, 246 F.2d p. 447. In any event, it is noted that during the 1956 tax year in question, plaintiff's net profit from his general contracting business was only around $3,000, while his net profit from the lot sales herein involved was over $58,000. This substantial income from his 34 sales of lots that year as compared with his other income is strong evidence that it resulted from a business activity. Thompson v. United States, supra; cf. Recordak Corp. v. United States, 325 F. 2d 460, 163 Ct.Cl. 294 (1963). And as the court stated in Snell v. Commissioner of Internal Revenue, supra, of the taxpayer therein involved: "He was not reselling land in the condition in which he bought it, but was subdividing and platting it and sometimes improving it * *. All was done with such purpose, system and continuity as well to constitute it a business." (97 F.2d p. 893)

Especially in this field of determining the tax aspects of sales of subdivided realty has it been repeatedly stressed that it is the overall, factual situation involved in the particular case that must govern. The isolation of and emphasis upon certain individual factors which constitute only threads in a complex situation should be guarded against, for it is the "total background of the transactions" and "the entire factual pattern of the case" that must govern. Gamble v. Commissioner of Internal Revenue, supra, 242 F.2d p. 592.

Considering all the facts and circumstances of this case, and particularly the background, the purpose, and the actual operation of the plaintiff-Jones agreement, it seems clear that plaintiff's continuous, frequent and substantial sales of lots from his acreage which he subdivided and improved constituted a business activity. Consequently, the gain therefrom should be taxed as ordinary income. It is accordingly recommended that the petition be dismissed.