Hart B. MORRISON et al., Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. C76–526.

United States District Court, N. D. Ohio, E. D.

March 7, 1978.

John. Kennedy Lynch, Cleveland, Ohio and Paul A. Weick, Cuyahoga Falls, Ohio, for plaintiffs.

David J. Curtin, Dept. of Justice, Tax Division, Washington, D. C., for defendant.

## MEMORANDUM OF OPINION AND ORDER

MANOS, District Judge.

Plaintiffs Hart B. Morrison and Theodore H. Case brought separate suits against the United States for the refund of federal income taxes assessed in 1970.[1] Since these two refund suits shared common questions of law and fact the court consolidated them for trial pursuant to Fed.R.Civ.P. 42(a). Jurisdiction is based upon 28 U.S.C. § 1346(a) (1970).

## FINDINGS OF FACT

Hart B. Morrison has been in the real estate business since 1920 when he acquired a real estate license from the State of Ohio. He has been engaged in the development and sale of residential and industrial real estate since at least 1949. Sometime in 1954–1955 he met Theodore H. Case, who was employed by the Geneva Telephone Company. At that time Morrison was developing a residential area in Newburg, Ohio.

In June 1969 Morrison and Case formed a partnership under the name of "Geneva Cottages." The purpose of the partnership was to acquire property immediately to the west of Geneva State Park in Geneva-on-the-Lake, Ohio and then attract other investors to join with the partnership in developing the property into a residential and recreational area. Besides money, Morrison and Case were to contribute their own unique skills to the partnership. Morrison was very experienced in acquiring and marketing real estate in the Geneva area, and Case, who had worked with Geneva area utilities, was uniquely qualified to handle arrangements for bringing power, water, and gas to the partnership's planned residential development.

In June of 1969 the Morrison and Case partnership began to acquire property to the west of Geneva State Park. Their first acquisition was a 3.8 acre tract purchased from Herbert E. and Nona J. Behner (hereinafter the "Behner property"). The property was transferred by a deed of trust executed on June 27, 1969. The Behners conveyed the property to the Ohio National Bank as trustee for Case and Morrison, and in exchange received $72,800 from the bank.

The second piece of property the Morrison and Case partnership acquired was a 8.2 acre tract owned by George H. and Catherine Johnson (hereinafter the "Johnson property"). On February 16, 1970 the partnership entered into a land contract with the Johnsons and agreed to pay them $150,000 for their property. The partnership put $2,000 down and agreed to pay the rest in two installments: $18,000 on July 15, 1970 and $130,000 on or before January 1, 1971. The contract provided that the partnership could not receive title until the full pur-

---

1. Hart B. Morrison and his wife, Margaret M. Morrison, filed a joint tax return in 1970, the year in question. Although Hart and Margaret Morrison are both plaintiffs in this action, for convenience only Hart Morrison is referred to in the text of the court's opinion. Likewise, Theodore H. Case and his wife, Natalie C. Case, also filed a joint return in 1970; and although Theodore Case has brought this action individually and as a co-executor of his wife's estate, for convenience only Theodore Case will be referred to in the text.

chase price was paid; that it could not take possession until 30 days after the title was transferred to it; that in lieu of interest on the unpaid purchase price the Johnsons were to receive the rents from the property until title passed; and that the taxes, assessments, and insurance on the property were to be prorated between the partnership and the Johnsons as of the date title was transferred.

On March 15, 1970 the Morrison and Case partnership acquired a third piece of property west of the Geneva State Park. It bought Jack D. and Inez C. Nightwine's contract rights [2] to 4.35 acres of land (hereinafter the "Nightwine property") and agreed to pay the Nightwines $64,457. The partnership immediately received possession of the property and became responsible for the payment of the taxes and insurance payments as of March 15, 1970. On July 20, 1970 $500 of the purchase price was paid to the Nightwines and on October 15, 1970 an additional $15,500 was paid them.

One final piece of property is involved in this suit, but one not purchased by the partnership itself. On January 15, 1970 Morrison, acting individually, bought a 162 acre tract from the B'Tawn Beach Club partnership (hereinafter the "B'Tawn property"). Case did not join Morrison in the purchase because he was a partner in the B'Tawn Beach Club. Morrison agreed to purchase this property for $425,000 under a land contract. He put $10,000 down on January 15, 1970 and agreed to pay the rest in two installments: $290,000 on or before December 1, 1970 and $125,000 on or before December 31, 1970. The terms of this land contract were the same as those in the contract the Morrison and Case partnership had entered into for the "Johnson Property": title was to remain in the B'Tawn Beach Club until payment of the entire purchase price; in lieu of interest on the unpaid purchase price the B'Tawn Beach Club was entitled to the rents from the property until title was transferred to Morrison; the taxes, assessments, and insurance on the property were to be prorated between the B'Tawn Beach Club and Morrison as of the date of transfer of title; and Morrison was not entitled to physical possession until 30 days after transfer of title.

Upon the acquisition of the Behner, Johnson, Nightwine, and B'Tawn properties Morrison and Case began the initial stages of their residential development project. They named their planned housing development "Shoreland Acres," retained an engineer for advice on subdivision, and hired an artist to do some preliminary sketches for use in a sales brochure.

On September 22, 1970 the State of Ohio announced that it was going to expand the Geneva State Park.[3] Shortly thereafter, Morrison and Case were notified of the state's intention to acquire the Behner, Johnson, Nightwine, and B'tawn properties and all plans for the proposed "Shoreland Acres" development were dropped. At the time they received notice of the threatened condemnation Morrison and Case were clearly holding their properties for sale to customers in the ordinary course of their business.[4]

2. On September 15, 1959 the Nightwines entered into a land contract with George and Catherine Johnson. Under the terms of this land contract the Nightwines took possession of the "Nightwine property," assumed the taxes and insurance payments for the property, and agreed to pay the Johnsons $4,000 a year until the $60,000 purchase price was paid off. This 1959 land contract was the contract that the Nightwines assigned to the Morrison and Case partnership in 1970 for the price of $64,-457.

3. Since at least 1965 rumors had circulated that the State of Ohio was going to expand Geneva State Park. In fact, in October of 1969 it be-

came public knowledge that the State of Ohio was urging the federal government to expand the park and make it into a national recreation area. The federal government never adopted the idea, however, and it was not until September of 1970, when the United States Department of Interior approved a 1.5 million dollar grant to the State of Ohio, that the state formally announced its plans to expand Geneva State Park.

4. The court's finding that Morrison and Case held their properties "primarily for sale to customers in the ordinary course of their business" is based upon the testimony the plaintiffs

gave at trial. A sampling of this testimony is set out below.

*Morrison on direct examination*

Q  Now, when was this [the Morrison and Case] partnership formed?

A  In the '60's, late '60's.

Q  And what was the purpose of the partnership?

A  The purpose of the partnership was to buy some property and develop it at Geneva-on-the-Lake.

Q  Did the partnership ever buy any property?

A  Yes, sir.

Q  And what did they buy?

A  We bought a property that was known as the Johnson property at Geneva-on-the-Lake, or Pearl Beach; the Nightwine property, which is adjoining the Johnson property on Geneva-on-the-Lake; and a property that was called the Behner property at Geneva-on-the-Lake.

Q  Now, what was the purpose of buying this property?

A  The purpose of buying this property was to put several hundred acres together and develop it, improve it and develop it.

Q  Now, you say you purchased these parcels of land for development?

A  Yes, sir.

Q  What type of development?

A  Well, to build residences, apartments. We also—I should answer—?

Q  Yes.

A  We also was trying to buy the golf course and have a resort development at Geneva-on-the-Lake.

Q  Now, exactly how did you plan to work this development?

A  Planned to put the property together and form a corporation. After we got the property put together, with four people, we was all going to put in $250,000 apiece, which was to be a million dollars, and borrow the rest of the money to purchase and develop.

*Case on direct examination*

Q  Now, would you describe for the Court the proposed development that was contemplated by the partnership in 1969 for the area surrounding the B'Tawn Beach Club in Ashtabula County?

A  Basically, the total development is only partially shown on the map here to my right. The total concept was a boundary on the west side of Wheeler Creek Road, going south from the lake to a point which would be somewhat below that area shown, where there is a CEI right-of-way. Next to this CEI right-of-way is a proposed interstate highway, which would be located north of 90. It still is proposed and on the maps. Using that as a southernmost boundary, going eastward towards the state park area, and then north, back up north again, and utilizing this entire area for a development.

Q  And what type of development did you and Mr. Morrison contemplate for this proposed area?

A  Well, the CEI right-of-way would be the buffer zone between the industrial area of the right-of-way, which would be south of the CEI right-of-way, to the railroad tracks. The right-of-way would be the buffer zone, and then of course you would have possibly some type of lower rent or low condominium type housing, and developing northward then into your most expensive and more exclusive areas, developing the golf course. And eventually I had even talked with the county about raising the county highway bridge and putting a—if the state did not come in, which we didn't expect them to, we would put in our own harbor. And it was very possible to put it in. Work was done on that with the director of development for the County of Ashtabula at that time.

*Case on cross-examination*

Q  Now, it is a fact, is it not, Mr. Case, that the idea behind the Geneva partnership was in fact to put together a total package for development and then sale; isn't that correct?

A  Total development and then sale? Yes.

This testimony on the plaintiffs' intentions when the property was acquired, along with Morrison's considerable background as a real estate developer, overwhelmingly convinced the court that Morrison and Case held their properties "primarily for sale to customers in the ordinary course of their business" at the time they learned about the expansion of the Geneva State Park.

The plaintiffs have argued against such a finding. They point out that during the time they held the four properties in question the land was *undeveloped.* If the court determines that they were in the business of selling *developed* land, they argue, then any sale of undeveloped land would not be a sale to a customer in the ordinary course of their business, but would be the sale of a capital asset that would generate a capital gain.

The court disagrees. The purchase of these four properties was unalterably related to the plaintiffs' business of developing and reselling real estate, and it cannot reasonably be considered to have been an "investment" by the plaintiffs. As the Tax Court has held:

Ordinarily, purchasing and holding raw acreage is an integral part of the subdivision development business, and in the absence of special circumstances, such acreage is not a capital asset. That petitioner held the land in question undeveloped for about three years in no way demonstrates that petitioner did not intend to keep it in its inventory of raw land for eventual development. . . .

On December 7, 1970 upon the instructions of Morrison and Case, the Northeastern Ohio National Bank transferred the title to the Behner property to the State of Ohio. Subsequently the state paid the bank $175,000. The bank then discharged the deed of trust it held on the Behner property and paid the remainder of the $175,000 to Morrison and Case.

On December 7, 1970, the same day that the bank deeded the Behner property to the State of Ohio, George and Catherine Johnson deeded the Johnson property to Morrison and Case;[5] and on December 11, 1970 Morrison and Case sold the Johnson property to the state for $334,000. They then paid the Johnsons the $110,000 outstanding on the original purchase price.

On December 11, 1970 Morrison and Case also sold the Nightwine property to the State of Ohio.[6] They were paid $139,000 and they then paid the Nightwines the $48,457 they owed on that property.

Morrison's sale of the B'Tawn property was handled differently from the other three sales. He had bought the B'Tawn property under land contract and the title was to remain in the name of the B'Tawn Beach Club until the amounts due under the contract were paid. On December 4, 1970 the B'Tawn Beach Club conveyed title to the B'Tawn property in trust to Howard Nazor. Nazor was instructed to hold the property for the benefit of Morrison and to convey the property to him upon the payment of the balance due the B'Tawn Beach Club on the land contract. On December 17, 1970, before the B'Tawn Beach Club had received any further payment from Morrison, Nazor conveyed to the State of Ohio both legal and equitable title to the B'Tawn property. The state subsequently paid Nazor $565,000 and he then paid the B'Tawn Beach Club the balance due on the land contract. The remainder he turned over to Morrison.

In their income tax returns for 1970 Morrison and Case reported the gains they realized from the sales of their properties as long-term capital gains. The Internal Revenue Service (IRS) examined their tax re-

---

Land which is held by a developer principally for development and sale, even when undeveloped for an extended period of time, is "property held primarily for sale to customers in the ordinary course of his trade or business" within the ambit of section 1221

. . . .

*Ridgewood Land Company, Inc.,* 31 Tax Ct. Mem.Dec. (CCH) 39, 45 (1972), aff'd, 447 F.2d 135 (5th Cir. 1973). *Accord, Tri-S Corporation,* 48 T.C. 316, 316 (1967); *Evwalt Development Corporation,* 22 Tax Ct.Mem.Dec. (CCH) 220, 228 (1963); *James E. Kesicki,* 34 T.C. 675, 678–79 (1960); *see Estate of Freeland v. Commissioner of Internal Revenue,* 393 F.2d 573, 583–84 (9th Cir. 1968), aff'g, 25 Tax Ct.Mem. Dec. (CCH) 1475 (1966).

The court recognizes that the Tax Court has not adhered consistently to the above holding in *Ridgewood. See Gustav B. Biedermann,* 68 Tax Ct.Rep. (CCH) 1, at 2570 n. 5 (1977); *Pontchartrain Park Homes, Inc.,* 22 Tax Ct. Mem.Dec. 437, 442–43 (1963), aff'd, 349 F.2d 416 (5th Cir. 1965); *see also, Commissioner v. Tri-S,* 400 F.2d 862, 864 (10th Cir. 1968), aff'g in part, 48 T.C. 316 (1967). Nonetheless, the court finds the reasoning in *Ridgewood* persuasive. Property acquired by a developer for eventual development and resale should be considered a part of the taxpayer's inventory rather than a capital asset. To hold otherwise would straddle the court with the unmanagea-

ble task of determining when such undeveloped land becomes developed enough to be considered inventory.

It seems more judicious to require a developer to prove either that the property was not acquired for purposes of development and resale or that the purpose for which the property was held had changed sometime between acquisition and resale. *See* Note, *Federal Income Taxation: The Effect of Condemnation on Property Held Primarily for Sale to Customers in the Ordinary Course of the Taxpayer's Business,* 6 Loyola U.L.J. 622, 634–35 (1975).

5. The record does not indicate, but apparently the Johnsons waived their rights under the land contract they had with Morrison and Case when they deeded the property to the partnership. They undoubtedly did this in expectation of immediate payment by the partnership upon the property's sale to the State of Ohio.

6. The record does not indicate when Morrison and Case obtained title to the Nightwine property, but a certificate of title prepared by a Geneva attorney certified that they had title at least as soon as December 8, 1970. (*See* Defendant's Exhibit R). Apparently, the Nightwines waived their rights under the land contract and transferred title to the partnership in the expectation of immediate payment upon the property's sale to the State of Ohio.

turns and determined that the proceeds from the sale of these properties should have been reported as ordinary income instead of long-term capital gains. Accordingly, the IRS assessed a tax deficiency against Morrison in the amount of $106,556.35 (including interest) and against Case in the amount of $61,908.65 (including interest). Both Morrison and Case paid these assessed tax deficiencies in full and then filed timely refund claims with the IRS. After the IRS denied both their claims in full they filed suit in this court pursuant to I.R.C. § 7422.

*An ultimate finding of fact: Were the properties capital assets at the time of their sale to the State of Ohio?*

The Internal Revenue Code provides preferential capital gains treatment for the profit realized by the sale of a "capital asset." I.R.C. § 1221 excludes certain types of property from the definition of "capital asset." Among the exclusions is property held primarily for sale to customers in the ordinary course of a taxpayer's business.

> For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his business), *but does not include* —
>
> (1) . . . property . . . included in the inventory of the taxpayer . . . or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business . . . .

I.R.C. § 1221(1) (emphasis added).

█ The Sixth Circuit has consistently taken the position that whether or not a taxpayer holds property "primarily for sale to customers in the ordinary course of his trade or business" is a question of fact. *Philhall Corporation v. United States,* 546 F.2d 210, 214 (6th Cir. 1976); *Mathews v. Commissioner of Internal Revenue,* 315 F.2d 101, 107 (6th Cir. 1963); *Bauschard v. Commissioner of Internal Revenue,* 279 F.2d 115, 117 (6th Cir. 1960); *Harry Slatkin Builders v. Commissioner of Internal Revenue,* 235 F.2d 189, 189–190 (6th Cir.) *cert. denied,* 352 U.S. 928, 77 S.Ct. 227 (1956). *Shephard v. United States,* 231 F.2d 445,

445 (6th Cir. 1956); *Dougherty v. Commissioner of Internal Revenue,* 216 F.2d 110, 111 (6th Cir. 1954). Often the trier of fact is required to draw inferences from other facts in order to determine whether a taxpayer holds property primarily for sale to customers in the ordinary course of business. *See e. g., Ridgewood Land Company, Inc.,* 31 Tax Ct.Mem.Dec. (CCH) 39, 43 (1972); *Juleo, Inc.,* 30 Tax Ct.Mem.Dec. (CCH) 284, 285 (1971). Factual inferences drawn by the trier of fact are known as ultimate facts, *Moore v. United States,* 246 F.Supp. 19, 21 (N.D.Miss.1965); *cf. The Evergreens v. Nunan,* 141 F.2d 927, 928 (2d Cir. 1944) (discussion of ultimate facts in res judicata context), and the decisions of courts that have had to draw similar factual inferences often guide the trier of fact in finding ultimate facts.

In the instant case the plaintiffs urge the court to find that the threat of condemnation by the State of Ohio converted their properties into capital assets. They point out that when the state made known its intentions to acquire their properties, they abandoned all their development plans. Thereafter, they claim, they held these properties solely for purposes of investment. Therefore, they argue the court should find as an ultimate fact that the properties were capital assets at the time of sale.

In support of their position the plaintiffs rely upon a line of cases in which threatened condemnations were found to have so frustrated the intentions of real estate developers that properties they held primarily for sale to customers in the ordinary course of business were converted into capital assets. *Ridgewood Land Company, Inc. v. Commissioner of Internal Revenue,* 477 F.2d 135 (5th Cir. 1973); *aff'g,* 31 Tax Ct. Mem.Dec. (CCH) 39 (1972); *Commissioner of Internal Revenue v. Tri-S Corporation,* 400 F.2d 862 (10th Cir. 1968); *aff'g,* 48 T.C. 316 (1967); *Juleo, Inc.,* 30 Tax Ct.Mem.Dec. (CCH) 284 (1971), *rev'd,* 483 F.2d 47 (3d Cir. 1972), *cert. denied,* 414 U.S. 1103, 94 S.Ct. 737, 38 L.Ed.2d 559 (1973); *see also Gustav B. Biedermann,* 68 Tax Ct.Rep. (CCH) 1

(1977) (county's refusal to allow taxpayer to develop his land so frustrated taxpayer's intentions that it changed property he held primarily for sale to customers in the ordinary course of business into a capital asset); *Maurice F. Fabiani,* 32 Tax Ct.Mem.Dec. (CCH) 941 (1973) (proposed damn project so frustrated taxpayer's intentions to develop that it changed property he held primarily for sale to customers in the ordinary course of business into a capital asset).

▆▆▆ Taken together, the decisions relied upon by the plaintiffs supply convincing authority for ruling in their favor on this issue. A taxpayer's purpose can change during the period in which he holds property, and it has long been recognized that in such cases it is the purpose for which a taxpayer holds his property during the period prior to sale that is determinative of the characterization of the property. *E. g., Tibbals v. United States,* 362 F.2d 266, 273, 176 Ct.Cl. 196 (1966). For example, a taxpayer may acquire property solely for investment purposes and then, while he is holding the property, decide to go into the business of subdividing and selling this property. Such a change of purpose would convert property that was originally a capital asset into property held primarily for sale to customers in the ordinary course of business. And since it is the purpose for which the taxpayer holds the property during the period prior to sale that is determinative of the characterization of the property, such property would not be characterized as a capital asset and any gain realized on its sale would not receive capital gains treatment. *E. g., Nadalin v. United States,* 364 F.2d 431, 438, 176 Ct.Cl. 1032 (1966); *see also Eline Realty Company,* 35 T.C. 1, 6–7 (1960) (after subdivision the purpose for holding an odd-shaped lot changed from one of sale to customers, to one of investment).

A similar change of purpose can occur when a developer has property threatened by condemnation before he has begun to make any improvements. If after the developer learns of the condemnation, he abandons his development plans, his purpose for holding the property changes and he no longer holds the property primarily for sale to customers in the ordinary course of business. The Tax Court's opinion in *Ridgewood Land Company, Inc.,* 31 Tax Ct. Mem.Dec. (CCH) 39 (1972), aff'd, 447 F.2d 135 (5th Cir. 1973) illustrates just such a change of purpose by a developer.

The taxpayer in *Ridgewood* was a development corporation that had purchased an 80 acre tract of raw land in 1962 with the intention of constructing a residential development. In 1964 the State of Mississippi condemned this land before any improvements were made. While the land was condemned the taxpayer sold it to an individual who owned undeveloped acreage adjacent to it and the taxpayer reported the gain on the sale as a capital gain. When the IRS challenged the taxpayer's characterization of this 80 acre tract as a capital asset the Tax Court ruled in favor of the taxpayer stating:

After [the taxpayer] received what it considered to be a threat of condemnation in September 1964, its officers realized that it would be futile to hold the land any longer for eventual residential development; their original objective in holding [the property] had to be abandoned and thereafter the land was held primarily for speculation and investment. . . . By the time of the disposition of the land in question in the latter part of 1965 and 1966, [the taxpayer's] purpose with regard to [the property] had been so altered by circumstances beyond its control that the character of the land could no longer be considered within section 1221(1), . . . ., [the property] was no longer held "for sale *to customers in the ordinary course of * * * business.*"

*Ridgewood Land Co., Inc.,* 31 Tax Ct.Mem. Dec. (CCH) 39, 46 (1972) (emphasis in the original), aff'd, 477 F.2d 135 (5th Cir. 1973); accord, *Tri-S Corporation,* 48 T.C. 316 (1967), aff'd, 400 F.2d 862 (10th Cir. 1968); *Juleo, Inc.,* 30 Tax Ct.Mem.Dec. (CCH) 284 (1971), rev'd, 483 F.2d 47 (3d Cir. 1972).

The Tax Court's *Ridgewood* decision becomes more persuasive when the legislative purpose behind the preferential treatment

of capital gains is examined. The purpose of the capital gains provisions is to differentiate between " 'the realization of appreciation in value accrued over a substantial period of time.' " *Malat v. Riddell,* 383 U.S. 569, 572, 86 S.Ct. 1030, 1032, 16 L.Ed.2d 102 (1966); *see also Corn Products Refining Co. v. Commissioner of Internal Revenue,* 350 U.S. 46, 52, 76 S.Ct. 20, 100 L.Ed. 29 (1955). When a developer abandons plans to develop property, he no longer seeks the profits that would " 'arise from the everyday operation of his business.' " Any profit a developer receives from the sale of land for which he has abandoned plans to develop represents " 'the realization of appreciation in value [that has] accrued over a period of time.' " Such profits are not the fruits of the everyday operation of a developer's business and should not be taxed as ordinary income. *See Ridgewood Land Company, Inc.,* 31 Tax Ct.Mem.Dec. (CCH) 39, 46 (1972). Allowing real estate developers the benefit of capital gains treatment in situations like the one in *Ridgewood* is therefore in keeping with the legislative purpose behind the preferential treatment of capital gains.

Notwithstanding the line of authority cited by the plaintiffs, the government urges the court to find as an ultimate fact that the plaintiffs' properties were not capital assets. It argues that it is inequitable to allow a developer the benefit of capital gains treatment when undeveloped land he holds primarily for sale to customers in the ordinary course of business is sold under threat of condemnation. In support of its position the court relies upon two decisions: *Juleo, Inc. v. Commissioner of Internal Revenue* and *Thomas K. McManus.*

In *Juleo, Inc. v. Commissioner,* 483 F.2d 47 (3d Cir. 1972); *rev'g,* 30 Tax Ct.Mem. Dec. (CCH) 284 (1971), the Third Circuit reversed the Tax Court and refused to hold that a threat of condemnation changed land held by a developer primarily for sale to customers in the ordinary course of business into a capital asset. In a short passage the Third Circuit set out its reason for holding in favor of the government:

[If] there had been no condemnation, the land which was part of the development would have been sold as such and the proceeds treated as ordinary business income. When the condemnation took place, the owner sought to establish a value, for purposes of the condemnation award, that reflected what the owner would have received if the land had been sold as developed. Consequently, to treat the income actually received, which in large part reflected the intent and plan of the owner, as capital gains rather than ordinary income would appear to be inequitable.

*Id.* at 49.

The income a developer receives from a condemnation award does not reflect the developer's intentions and plans when his property is sold in an unimproved state under threat of condemnation. The condemnation award in such cases is normally far short of the amount the developer would have received had he carried out his proposed plans for the property's development; and the gain realized on such a sale does not represent "profits that arise from the everyday operation of the developer's business." Rather, such a gain more accurately represents " 'the realization of [the] appreciation in value' " that has accrued over the period of time the developer has held the property. When sold under threat of condemnation, therefore, a developer's unimproved property would be more properly characterized as a capital asset, and not as property held primarily for sale to customers in the ordinary course of the developer's business.

More importantly, this court is not persuaded by the Third Circuit's *Juleo* decision because it disregarded the Tax Court's specific factual finding that at the time of the sale to the state the taxpayer held his property for investment purposes. *Juleo, Inc.,* 30 Tax Ct.Mem.Dec. (CCH) 284, 285 (1971). As the dissent pointed out, the Third Circuit's decision effectively overruled this finding of fact without discussion. *See Juleo, Inc. v. Commissioner of Internal Revenue,* 483 F.2d 47, 49–51 (3d Cir. 1972) (Gib-

bons, J., dissenting). *See* Note, *Federal Income Taxation: The Effect of Condemnation on Property Held Primarily for Sale to Customers in the Ordinary Course of the Taxpayer's Business*, 6 Loyola U.L.J. 622, 637–41 (1975) (trenchant criticism of the Third Circuit's *Juleo* decision).

Furthermore, the Third Circuit's *Juleo* decision is an anomaly; the other circuits that have reached this issue have not held in favor of the government. *See Ridgewood Land Co., Inc. v. Commissioner of Internal Revenue,* 477 F.2d 135 (5th Cir. 1973); *Commissioner of Internal Revenue v. Tri-S Corporation,* 400 F.2d 862 (10th Cir. 1968). And despite a number of opportunities to do so, the Tax Court has not retreated from the position taken in its *Tri-S, Ridgewood* and *Juleo* decisions. *See Gustav B. Biedermann,* 68 Tax Ct.Rep. (CCH) 1, at 2570 & n. 6 (1977); *Thomas K. McManus,* 65 T.C. 197, 215 (1975); *Maurice F. Fabiani,* 32 Tax Ct.Mem.Dec. (CCH) 941, 946–47 (1973).

The other decision relied upon by the government is *Thomas K. McManus,* 65 T.C. 197 (1975). In *McManus* the taxpayer was in the business of purchasing raw land, improving it through subdivision and road construction, and reselling it. In 1961 he purchased the property in question. He then filed a subdivision plat map and spent $240,000 on road construction and the installation of sewage, water, and gas lines. In 1968 the State of California condemned some of his property and he was forced to sell the part condemned. He reported the gain from the sale as a capital gain and the IRS challenged it. The IRS claimed he had held the property primarily for sale to customers in the ordinary course of his business and should therefore have reported the gain as ordinary income.

When the matter reached the Tax Court the taxpayer relied upon that court's earlier decisions in *Ridgewood, Juleo,* and *Tri-S* and argued that "once the prospect of condemnation materialized, the plots involved

were no longer held for sale to customers in the ordinary course of his business." 65 T.C. at 215. The Tax Court distinguished its earlier decisions however and ruled against the taxpayer stating:

In the case at hand we do not believe that the condemnation factor changed the [taxpayer's] intention in the manner found by this Court previously. From the evidence in the record we believe that the [taxpayer] was in the business ab initio of purchasing raw land, improving it, and holding it for sale in that condition to prospective customers. Various governmental authorities could use the property in that condition and as such they represented potential customers for the [taxpayer's] property.

The record indicates that the [taxpayer] recognized the various governmental authorities as potential customers. . . . Further, it appears that the amount paid by the State represented the amount that would have been paid by any other potential customers.

In our view, the condemnation element did not bring any unexpected customers to the [taxpayer's] door, but rather served as the means by which the sale was conducted. We see no reason then why the gain produced by the sales to governmental customers should be treated any differently than the gain realized by sales to other customers.

*Id.* at 215–16.

The government argues that the court should follow the *McManus* decision because the plaintiffs bought their properties in expectation of the state acquiring them. The government's contention however is not supported by the record. Despite the government's efforts, it never established that the plaintiffs knew the state would acquire the properties.[7] The plaintiffs steadfastly maintained that they did not buy their properties as speculators, and

---

**7.** It was not established that the plaintiffs knew any more than the general public did about the state's interest in the area west of the Geneva State Park. And although contradictory rumors existed in 1969–70 about the state's possi-

ble acquisition of land in this area (*see* note 3, *supra*), no evidence was introduced that pointed to the plaintiffs having prior knowledge of the state's intentions.

they repeatedly avowed their long-term interest in developing the property. Their testimony was uncontested; therefore the court does not find that the plaintiffs looked upon the State of Ohio as a potential customer that would purchase from them in the ordinary course of their business.

The government alternatively argues that the *McManus* decision sharply undermines the authority of the three Tax Court decisions the plaintiffs have cited to the court. The court has carefully studied the *McManus* decision, however, and finds it distinguishable in several important respects from the Tax Court's earlier decisions in *Tri-S, Ridgewood,* and *Juleo.*

In *McManus* the taxpayer was in the business of purchasing raw land, improving it to a certain point, and then reselling it. The condemnation of the taxpayer's land in *McManus* occurred *after* the taxpayer had completed his intended improvement of the property. There was no frustration of his development plans when he learned of the threatened condemnation of his property; therefore, the Tax Court found that the purpose for which he held the property did not change and that he held the property primarily for sale to customers in the ordinary course of his business at the time of the sale to the state.

As the Tax Court stated, once the taxpayer's improvements were complete the State of California was in the same position as any other potential customer of the taxpayer. *Id.* The gain the taxpayer in *McManus* realized upon the sale to the state, therefore, represented "the profits arising from the everyday operation of his business" and was properly taxed as ordinary income.

In *Tri-S, Ridgewood,* and *Juleo* the Tax Court found that the threats of condemnation occurred *before* the taxpayers had substantially begun their intended improvements, and that the taxpayers' plans to develop and resell their properties were frustrated by the threats of condemnation. The gains these taxpayers realized on the sales of their properties therefore did not represent "the profits arising from the everyday operation of their business," and consequently their gains were not taxed as ordinary income.

In light of these obvious distinctions the court finds the *McManus* decision easily reconcilable with the Tax Court's earlier decisions in *Tri-S, Ridgewood,* and *Juleo.*

In conclusion, the court is not persuaded by the government's arguments for diminishing the authority relied upon by the plaintiffs. Accordingly, the court rules in favor of the plaintiffs on this issue and makes the following findings of ultimate fact: the threat of condemnation by the State of Ohio so frustrated the development plans of the plaintiffs that they changed the purpose for which they held the Behner, Johnson, Nightwine, and B'Tawn properties; after the threat of condemnation they no longer held these properties primarily for sale to customers in the ordinary course of business, but rather, they held them for investment purposes. Therefore, these properties were capital assets at the time of their sale to the State of Ohio.

## CONCLUSIONS OF LAW

■ Long-term capital gains are taxed at half the rate at which ordinary personal income is taxed. I.R.C. § 1202. In order for a taxpayer to receive long-term capital gains treatment for the gain realized on the sale of property, the property must be a "capital asset" that the taxpayer has held for more than six months.[8] I.R.C. § 1222(3).

■ The court has found that the four properties at issue in this case were capital assets at the time of their sale to the State of Ohio. And the government has conceded that two of these properties, the Behner and Nightwine properties, were held by the

8. I.R.C. § 1222(3) has been changed since the plaintiff filed his 1970 tax return. The Tax Reform Act of 1976, Pub.L. No. 94–455, 90 Stat. 1785 (1976) has changed the holding period of capital assets to one year instead of six months. For the 1977 tax year the holding period is nine months and for all years thereafter it will be one year.

plaintiffs for more than six months. The court therefore holds that the gain realized on the sale of the Behner and Nightwine properties was a long-term capital gain.

The government does not concede that the plaintiffs held the Johnson or the B'Tawn properties for more than six months; and it argues that the gain realized on the sale of these two properties is not eligible for long-term capital gains treatment.

### The Johnson Property

On September 7, 1977, before the plaintiffs' refund suits were consolidated for trial, this court issued a Memorandum of Opinion and Order on the cross-motions for summary judgment by Morrison and the government. One of the issues decided on summary judgment was whether or not the Johnson property had been held for more than six months. The court decided it had not.

At trial the court heard Case's arguments on this issue, and in substance, Case's arguments are no different from those raised by Morrison in his motion for summary judgment. The court's September 7, 1977 Memorandum of Opinion and Order adequately discussed the reasons for rejecting these arguments and they need not be repeated here; in accordance with that opinion therefore, the court holds that the plaintiffs did not hold the Johnson property for more than six months. Consequently the gain realized on its sale was not a long-term capital gain.

### The B'Tawn Property

Another issue that was raised on summary judgment by Morrison and the government was whether the B'Tawn property had been held for more than six months. The court declined to reach that issue then because important aspects of the transactions involving the B'Tawn property remained unclear and made the issue unsuitable for disposition on summary judgment. Fed.R.Civ.P. 56. Unfortunately, the court knows no more about the intricacies of the B'Tawn transaction now than it did when this issue was considered on summary judgment.

In short, the court knows only that Morrison had entered into a land contract for the purchase of the B'Tawn property; that before the contract's terms were complied with, the B'Tawn Beach Club transferred legal title to a trustee instructing him to hold the B'Tawn property for the benefit of Morrison; and that subsequently, the trustee sold both legal and equitable title to the State of Ohio and distributed the proceeds to the B'Tawn Beach Club and Morrison.

Morrison argues that he sold the State of Ohio his rights under the land contract he had with the B'Tawn Beach Club. Since he acquired those rights more than six months before the sale to the state, he maintains he should receive long-term capital gains treatment from the proceeds of that sale.

The burden of proof on this issue lies with Morrison, e. g., *Estate of Freeland v. Commissioner of Internal Revenue,* 393 F.2d 573 (9th Cir. 1968), and no documentation of an assignment to the state of his contract rights has been introduced. Moreover, Morrison's counsel did not even discuss the B'Tawn transaction at trial. The court therefore holds that Morrison has not sustained his burden of proving that he sold contract rights to the state.

From the record it appears that the land contract was rescinded when the trust was created. In the court's view the trust was, in effect, a means by which the parties modified their original contractual obligations. Therefore, the court holds that at the time of the sale to the state the only interest Morrison had in the B'Tawn property was the equitable interest he held as beneficiary to the trust, and it was from the sale of that interest that he realized a capital gain from the B'Tawn transaction.

Since Morrison acquired this equitable interest on December 4, 1970, the day the trust was created, and then sold it on December 17, 1970, he did not hold it for more than six months and the gain he realized cannot be treated as a long-term capital

gain. *See Helvering v. Gambrill,* 313 U.S. 11, 61 S.Ct. 795, 85 L.Ed. 1155 (1941).

### DISPOSITION OF THE CASE

In accordance with the reasoning set out above, the court grants the plaintiffs' claim for refund of the excess taxes assessed on the gain they realized from the sale of the Behner and Nightwine properties, but denies the plaintiffs' claim for refund of the taxes assessed on the gain they realized from the sale of the Johnson and B'Tawn properties.

IT IS SO ORDERED.